## HOLLAND BANKING COMPANY *v.* BOOTH.

### Opinion delivered November 22, 1915.

1. BILLS AND NOTES—BONA FIDE HOLDER—ALLEGATIONS IN ANSWER.—In an action on a note in which the plaintiff asserts that he is a holder for value, without notice of defects, before maturity, an answer filed by defendant, denying the plaintiff's good faith is sufficient to raise the issue as to whether plaintiff was a purchaser in good faith in the regular course of business.

2. BILLS AND NOTES—BONA FIDE HOLDER—QUESTION FOR JURY.—Notes were given by appellees for the purchase of certain horses, which were sold with certain stipulations and guarantees. The payees of the notes sold the same to appellant bank, without recourse. *Held,* when it appeared that the payees of the note were stockholders in the bank, that the bank had no knowledge of appellee's financial standing, and that taking paper in this way was exceptional with the bank, that it was a question for the jury, whether the bank was a holder of the notes, in good faith, although the officer of the bank who purchased the same testified that the bank had no knowledge of any infirmity in the notes.

3. BILLS AND NOTES—BONA FIDES—EVIDENCE OF CUSTOM OF BANKS.—In an action on a note, when the issue of the *bona fides* of the holder is raised by testimony showing that the note was bought without recourse on the payee and without an investigation of the maker's financial standing, testimony by a banker, duly qualified, as to the custom and practices of banks in a certain locality, as to the matters in issue, is admissible.

Appeal from Sebastian Circuit Court, Greenwood District; *Daniel Hon,* Judge; affirmed.

#### STATEMENT BY THE COURT.

These suits were instituted by the appellant, a Missouri corporation, to recover upon certain promissory notes. The complaints in each case were substantially the same, the only difference being as to the amounts, dates and time of maturity of the notes, and the notes were executed by different sets of makers, who are the appellees herein. The notes were the same in form and it will be sufficient to give substantially the provisions of one of them. In the notes the makers jointly and severally promise to pay, for value received, to the order of the Holland Stock Farm, a certain sum at the Bank of Midland, Arkansas, with interest at 6 per cent per annum

from date until paid. Certain payments had been made on each of the notes and the suit was for the balance of the principal and accrued interest.

The appellant alleged that it was an innocent purchaser, for value, of the notes sued on. The appellees set up that their signatures were obtained by fraud, in that the agent of the Holland Stock Farm, who made the sale of the horse for the purchase price of which the notes were executed, procured the signatures of the appellees by representing that neither he nor the Holland Stock Farm had sold a similar stallion, or stallion of any kind, within a radius of twenty-five miles of the town of Bonanza, and also that they would not sell a stallion within that radius; that he further represented that the stallion would foal at least 75 per cent. of the mares to which he was let; that these representations constituted a part of the consideration which induced the appellees to sign the notes; that these representations were false; that the stallion was unsound and wholly unfit for the purpose for which he was purchased, which appellees did not know and could not know, but which the agent of the Holland Stock Farm who conducted the negotiations did know at the time; that the appellees relied wholly upon these statements and representations of the agent of the Holland Stock Farm; and that they had already paid much more than the fair market value of the stallion; that he was not worth more than $600.

The suits being instituted by the same plaintiff and the issues being identical, were, by consent of the parties, consolidated for trial.

W. B. Sanford, the president of the Holland Banking Company, testified that at the time the bank acquired the notes in controversy he was the cashier; that these notes were purchased from Charles Holland, who was the proprietor of the Holland Stock Farm; that they were all purchased before maturity and for value. His testimony shows that the corporators of the Holland Banking Company, hereafter called the bank, were C. B. Holland, his son T. B. Holland, W. B. Sanford, Mrs. B. A. Holland,

wife of T. B. Holland, and C. E. Sanford, wife of W. B. Sanford; that the Hollands and the Sanfords owned all the stock, that Sanford was a brother-in-law of Holland. At the time of acquiring the notes in controversy they also acquired other notes from Charles Holland, amounting in the aggregate to $15,900. The notes were all indorsed "without recourse." On some of them the indorsement was with a rubber stamp. At the time of the negotiations Charles Holland brought in papers concerning the solvency of the makers of the notes. Witness thinks that these papers were attached to the notes. He did not buy any notes that they did not have information on. He got the information from Charles Holland or from other parties. He did not remember whether Holland furnished it or whether witness obtained it from others as to the notes in controversy. He did not remember to whom he wrote but he received favorable replies or would not have bought them. He did not know where the replies were. They took the notes without recourse because Holland would not sell them any other way. Witness was not personally acquainted with the makers of the notes. They took such notes before with recourse and without recourse. It was the custom of the bank to take paper maturing in one, two or three years signed by strangers without rating at a discount on the note, if it had proper evidence that the notes were good. Witness could not tell what other banks in Missouri did, but they all did it more or less. Witness knew at the time he purchased the notes that they were given for the purchase price of horses purchased from Charles Holland. Witness guessed that they had purchased such notes from Holland to an amount somewhere from twenty-five to fifty thousand dollars. They had taken them all without recourse, and had never had any trouble with the exception of the notes in controversy and one other.

Witness was asked, over the objection of apellant, how many of these notes purchased of Charles Holland the bank had had suits on, and answered, "Three," to which appellant duly excepted. He was asked if he had

had trouble with a note in Yell County, and answered, over the objection of appellant, and further stated that they got judgment on that note, which was affirmed by the Supreme Court. He stated that he did not remember whether at the time the notes were purchased Charles Holland was indebted to the bank or not, and stated that if he was it was good; that the bank either paid him cash or gave him credit for the notes. Witness thought that Charles Holland had an account at the bank. Witness knew that he was a director when he sold the bank the notes, but he was not active in the management of the bank's business. His father assigned to him the stock that he owned for the purpose of the organization. Witness did not think that he ever attended a director's meeting, but, as far as the records were concerned, he was a director. Witness' testimony further showed that Charles Holland was engaged in the stock business on a large scale, raising, buying and selling livestock.

G. S. Mitchell, a witness on behalf of the appellants, testified that he was assistant cashier of the Holland Banking Company at the time of the negotiations between the bank and Charles Holland for the notes in controversy. He stated that it was not the custom of the bank to require the date of the transfer to be made on the note itself; that the bank did not buy past due notes. At different times Charles Holland owed the bank different amounts. Witness could not state how much he owed the bank at the time of these negotiations. The notes were indorsed "without recourse," but the bank had a written guaranty from T. B. Holland, the father of Charles Holland, to protect the bank in case of any loss on those notes. It covered all the notes that the bank purchased from Charles Holland without recourse. Witness did not know whether Charles Holland knew of that arrangement between the bank and his father or not. Witness was asked if it was the custom of the bank, or the banks in Missouri, to require customers to give written guaranty before taking a note without recourse, or whether the case of Charles Holland was an exceptional one, and he an-

swered that in some ways his case was an exceptional one; that the bank generally risked its judgment; that in the case of the notes in controversy there were some papers and letters attached to them showing the financial standing of the makers of the notes. Witness was asked what was the usual bank discount in discounting notes in Missouri, and answered, "On notes of that size we don't figure on getting over 6, 7 or 8 per cent., depending generally upon the customer." The guaranty of T. B. Holland, the father of Charles Holland, was a guaranty as to his indebtedness to the bank. Witness did not think that any particular notes were mentioned. The guaranty arose out of a private transaction between some of the stockholders and the officers of the bank, rather than between the bank and Mr. Sanford and the bank and Mr. Holland. To the deposition of this witness letters were exhibited from banks, addressed to the Holland Stock Farm, stating that in the opinion of the writers, who were cashiers of the respective Arkansas banks, the notes in controversy were considered good.

Witness McDaniel testified that he had been cashier of a bank in Missouri since 1891; that he was familiar with the rules and custom of the banking business in the State of Missouri, and especially in the city of Springfield. He was then asked, "Is it the custom of banks in the city of Springfield to take any notes and pay the face value of the note in money, just discount it whatever the rate of interest is?" and he answered, "I don't know whether we have such a custom. It would depend on who the people were; generally speaking, we would not unless it took a good rate of interest." The question and answer were objected to, and upon the objection being overruled the appellant excepted.

The witness was then asked, "Suppose the note was for $2,800 and took 6 per cent. interest, and was due in one, two and three years in equal payments, then would you take it and give the face value of the note for it where you did not know the people?" and answered, "Where it is done, it is the exception, and not the rule."

An objection to the question and answer was overruled and appellant duly excepted.

Witness then testified, on cross-examination, without objection, that 8 per cent. was the customary rate of interest; that on large loans it might be somewhat less, depending on how money is, who the people were, and what kind of security; that a customer who had been with the bank all the time would be entitled to get more liberal treatment than a stranger. Then, on re-direct examination, over the objection of appellant, witness was permitted to testify as to what methods were used by this bank in getting more than 8 per cent. interest by discounting paper.

There was testimony on behalf of the appellees tending to prove the allegations of their answer in regard to the representations made by the agent of the Holland Stock Farm who sold to appellees the horses for the purchase price of which the notes were executed and that these representations as made were false. It is unnecessary, in the view we take, to abstract this testimony in detail. Suffice it to say, the testimony tended to prove that the representations were made, that they were false, and that they constituted the inducement upon which the appellees purchased the horses and executed the notes in suit.

It was shown on behalf of the appellees that there was no contract to the effect that if the horses did not prove satisfactory they were to be returned and other horses furnished them. It was agreed that neither of the horses were returned to the Holland Stock Farm. It was shown that the appellees wrote and telegraphed the Holland Stock Farm complaining of their placing another horse in the territory contrary to the representations of its sales agent.

The appellant asked the court to instruct the jury to return a verdict in its favor for the amount sued for in each case which request was refused.

The appellant asked the court to instruct the jury that the fact that Charles Holand was a director of the

bank, and that the notes were indorsed without recourse could not be taken as notice to the bank of any infirmity in the notes. The court instructed the jury, over the objection of appellant, that these facts could not of themselves be taken as showing that appellant was not a *bona fide* holder of the notes.

The court, at the request of the appellant, instructed the jury that the burden was upon the appellees to prove by a preponderance of the evidence that the appellant acted in bad faith in the purchase of the notes and that the burden was upon the appellees to show that there was some infirmity in the notes at the time the same were purchased by the appellant, and that the appellant had notice of such infirmity at the time of its purchase; that although appellees might have a valid defense to the notes at the time appellant purchased them, that such defense could not be considered unless the appellant had notice thereof before or at the time of its purchase; or, unless it was in possession of such facts as would put a reasonably prudent person on inquiry; that knowledge of infirmity in the notes acquired since the notes were purchased by the appellant would not defeat its right to recover.

And over the objection of appellant the court instructed the jury that if the agent of Holland Stock Farm guaranteed the horses sold to be satisfactory breeders and that said guaranty was a part of the consideration that induced the purchase, and that guaranty failed, that this amounted to fraud against the appellees, and that in that event the appellant could not recover more than the market value of the horses unless the jury found that it was a *bona fide* holder of the notes. And, further, to the effect that unless appellant was a *bona fide* holder of the notes for value before maturity, if the appellees were induced to make the purchase by false and fraudulent representations of the agent of the Holland Stock Farm that the jury should find for the appellant what would be the fair market value of the horses, after deducting the amounts the appellees had paid upon the purchase price as agreed upon.

The court also instructed the jury that if the Holland Stock Farm violated its contract to the effect that it would not place another horse within twenty miles of the ones sold and appellees were damaged thereby, the jury should allow appellees for such damages provided they did not find that appellant was an innocent holder of the notes for value.

The trial resulted in a verdict and judgment in favor of the appellees. Exceptions to the rulings of the court were preserved and assigned as error in the motion for a new trial, which being overruled, appellant duly prosecutes this appeal.

*George W. Dodd*, for appellant; *A. C. Cunkle*, of counsel.

1. A verdict should have been directed for plaintiff. The execution of the notes is admitted; the assignment is not controverted. The proof is that appellant purchased the notes before maturity, for value without notice The notes were negotiable and the only defenses available were want of power in the makers and illegality of consideration. 42 Ark. 242. Where there is no evidence of the date of assignment, the legal presumption is, it was made before maturity. Gould's Dig., § 570; 31 Ark. 20, 128. But the date of the assignment was proven. 48 Ark. 454-7. The proof is that the bank paid full value for the notes. No oral agreement or understanding between the original parties variant from the terms of this written contract can be shown. 61 Ark. 80; 153 U. S. 233. There is no evidence that appellant participated in a fraudulent transfer of the notes, or of any bad faith in the purchase. 15 Ind. 508; 73 Pa. St. 286; 61 Ark. 80; 90 *Id*. 93.

2. Knowledge that a note was given in consideration of an executory contract of the payee which has not been performed, does not deprive the indorsee of the character of the holder in due course, unless knowledge of the breach is shown. The presumption is that the contract will be carried out in good faith and the consideration performed. 3 R. C. L., § 272-3; 7 L. R. A. 537; 4 A. & E. Enc. L. 305; etc.

3. Because the notes were taken "without recourse" does not make the transaction out of "due course." 80 Ark. 212; 14 Pa. St. 14; 11 Me. 253. The fact that Charles Holland was a director at the time of purchase raises no presumption of notice. 107 Ark. 232. No notice of fraud is shown, nor of facts from which fraud might be presumed. 4 A. & E. Enc. Law, 303; 61 Ark. 80; 16 M. & W. 355. The *bona fide* character of a holder can only be destroyed by proof of participation in a fraudulent transfer of the instrument. 61 Ark. 80.

4. The court erred in admitting testimony objected to by appellant, and in giving and refusing instructions. The appellant was entitled to the protection of an innocent holder or purchaser of commercial paper, which was not given.

*Holland & Holland,* for appellees.

1. The evidence sustains the verdict. It will not be disturbed. 87 Ark. 109; 79 *Id.* 608.

2. Appellant did not act in good faith in the purchase of the notes. The jury found it was not a purchaser in good faith. The jury did not believe Sanford's story. 145 S. W. 707. The notes were "without recourse." This put appellant on notice. 143 S. W. 293. The jury are not bound to accept as true uncontradicted testimony of an interested witness. 61 N. Y. S. 500; 55 S. W. 772; 68 *Id.* 203; 143 Pac. 561; 165 *Id.* 889; 162 *Id.* 1169; 136 Iowa 390; 15 Am. & Eng. Ann. Cases, 665; 82 Ark. 86. If there is any evidence to establish an issue it is error to direct a verdict. 105 Ark. 136.

3. There was evidence tending to show lack of good faith and the issue was fairly submitted to the jury by the instructions.

WOOD, J., (after stating the facts). (1) Counsel for appellant contend that the uncontradicted evidence shows that the appellant was a *bona fide* holder of the notes for value before maturity, and that the court therefore erred in refusing its prayer for a directed verdict. They say that the answer wholly fails to allege that the Holland Banking Company had, at the time of its

purchase of the notes, any notice or knowledge of the alleged misrepresentations of the agent of the Holland Stock Farm, nor does the proof, taken in its strongest light, show that the banking company had knowledge of the misrepresentations alleged. But the answer of the appellees, in which they deny that the appellant procured the notes in due course, and in which they deny that the appellant acted in good faith in the purchase of the notes, was sufficient to raise the issue as to whether the appellant was an innocent purchaser of the notes, that is, one who had purchased the notes for value, before maturity, and in good faith.

It is true that W. B. Sanford, who was the cashier of the bank at the time and purchased for it the notes in controversy, testified that he purchased the notes, paying face value for them, less the credits thereon, and received accrued interest down to the time of the purchase, and that at the time of the purchase he got information through the payee and holder of the notes and from others concerning the solvency of the makers that satisfied him that the notes were good. He bought them without recourse because the payee and holder would not sell them any other way, and he thought that they were good.

On cross-examination it was shown that Sanford, cashier, and Charles Holland, the holder of the notes, were brothers-in-law, and that the Holland family and the Sanfords owned all the stock in the bank.

(2) If this was all the testimony we would readily hold, that the evidence was insufficient to submit to the jury the issue of the bank's good faith in the purchase of the notes. But the testimony as disclosed by the record in this case was sufficient to make the issue of the bank's good faith in the purchase of the notes in suit one of fact for the jury. Here it was shown that the cashier, at the time he purchased the notes, knew they were given for the purchase price of horses from Charles Holland; that the bank had bought between twenty-five and fifty thousand dollars worth of notes of this character from Holland; that it had taken all of these without recourse; that

this indorsement was placed on some of the notes with a rubber stamp; that the bank had such a stamp; that when Holland presented the notes for sale he said that he had letters concerning the solvency of the makers, which he exhibited, and that the cashier wrote letters himself where he was not satisfied; that it was the bank's custom to take paper maturing in one, two or three years signed by strangers without any financial rating at a discount of the interest on the notes if it had proper evidence that the notes were good; that the bank either paid Holland cash or gave him credit for the notes; that he was a director of the bank and had an account there; that the bank bought the major portion of the notes that Holland took; that the cashier knew that he handled sheep, cattle and horses and transacted a large amount of business. It was further shown that Charles Holland, holder of the notes, owed the bank at different times different amounts. The witnesses were unable to say what the amount of his indebtedness was at the time of the purchase of the notes. The bank, at the time of the purchase, had a written guaranty from T. B. Holland, the father of Charles Holland, to protect the bank in case of loss on all the notes that the bank purchased from Charles Holland without recourse. It was not the usual custom of appellant bank or of the banks in Missouri to require customers to give a written guaranty before taking a note without recourse; that the taking of the notes from Charles Holland in this way was "an exceptional case;" that the usual bank discount in discounting notes in Missouri was 6, 7 or 8 per cent., depending generally upon the customer, the usual discount being from 6 to 8 per cent on long time notes. The witness who testified as to the guaranty stated later, in explanation, that he could not give the date of such guaranty, but it was on a date later than the notes, and that it arose out of a private transaction between the stockholders and officers of the bank rather than between Charles Holland and the bank; that Charles Holland was not a party to it. There was testimony that the customary rate of interest in Missouri was 8 per cent; that

they were allowed to charge that, but they usually got more.

It will be observed that the additional facts developed in this record justified the court in sending to the jury the issue as to whether or not the appellant purchased the notes in controversy in good faith.

The principle of law applicable here is stated in 3 R. C. L., p. 1075, sec. 280, as follows: "While the authorities uphold with much unanimity the rule that neither negligence, nor knowledge of suspicious circumstances, nor failure to make inquiries, will in or of itself amount to bad faith in a holder of negotiable paper who purchases it for value before maturity, yet they are equally consistent in holding that the existence of such facts may be evidence of bad faith sufficient to take the question to the jury. * * * Although suspicious circumstances are not notice as a matter of law, yet the jury may find them to be so as a matter of fact, and evidence going to show the existence of such grounds for suspicion is always admissible."

It is declared in our act to make uniform the law of negotiable instruments, (Act 81 Acts of 1913, sec. 56) that, "To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." This is but a reiteration of the rule which was well settled by our own court and the authorities generally before the passage of this act. See *Bothell* v. *Fletcher*, 94 Ark. 100; *Mee* v. *Carlson*, 29 L. R. A. (N. S.), p. 351, note, and summary at page 388 *et seq.*

"But the prevailing view for many years has been to the effect that mere ground of suspicion as to the existence of defenses to the instrument is not equivalent to knowledge thereof by the purchaser. * * * Knowledge, however, may be shown to have been possessed by the party either by direct proof, or by facts and circumstances that fairly lead to that conclusion, and circum-

stances that are not of any great probative force in them-selves are admissible in connection with other proof to show guilty knowledge or want of good faith.'' 3 R. C. L. pp. 1073-4-5, and cases in note; *Arnd* v. *Aylesworth,* (Iowa), 123 N. W. 1000, 29 L. R. A. (N. S.) 638.

The testimony of Sanford to the effect that he pur-chased the notes before their maturity, and that he paid value for them, and he knew nothing of the transaction between the makers of the notes and the seller of the horses, and that the notes were purchased in due course, would not have warranted the court, in view of other facts developed by his testimony and the testimony of other witnesses, in directing the jury to return a verdict in ap-pellant's favor. The good faith in making the purchase was still in our opinion, an issue of fact for the jury un-der the evidence.

In *Skillern* v. *Baker,* 82 Ark. 86, we said: ''It may be said to be the general rule that where an unimpeached witness testified distinctly and particularly to a fact and is not contradicted, and there is no circumstance shown from which an inference against the fact testified to by the witness can be drawn, the fact must be taken as es-tablished and a verdict directed accordingly, is inappli-cable where the witness is interested in the result of the suit, or facts are shown which might bias his testimony, or from which an inference might be drawn unfavorable to his testimony or against the fact testified to by him. Then the case should go to the jury.''

In *Olsen* v. *Hendrickson,* 12 Iowa 222, it is said: ''The witnesses, though unimpeached, may have such an in-terest in the question at issue as to affect their credibility, and furthermore, it is often a difficult question to decide when a witness is, in a legal sense, uncontradicted. He may be contradicted by circumstances as well as by state-ments of others contrary to his own.'' And in *Arnd* v. *Aylesworth, supra,* it is said: ''That circumstances un-der which a note is negotiated may be sufficient to sustain a verdict against the holder's positive denial of notice has been frequently held.'' See *McNight* v. *Parsons,* 136

Ia. 390, 15 A. & E. Ann. Cas. 665; *Bolt* v. *State Savings Bank,* 145 S. W. 707.

The court did not err in refusing to single out the fact that Charles Holland was a director, and the fact that the notes were indorsed without recourse, and in refusing to tell the jury that these facts could not be taken as showing that appellant was a *bona fide* holder of the notes. If these had been the only facts on the issues of good faith and due course such declarations might have been correct. But the above facts were proper to be considered in the case with all the other facts on that issue.

(3) The testimony of witness McDaniel showed that he had been a cashier of banks since 1891, and was familiar with the rules and customs of the banking business in the city of Springfield and in Missouri. His testimony related to the custom of banks in that city as to discounting paper and was competent on the issues as to whether appellant was a purchaser in due course and in good faith. Moreover witness Sanford had testified on cross-examination, that it was the custom of this bank to take paper in one, two and three years signed by strangers without rating at a discount on the note; witness stated he could not tell what banks in Missouri did. Nevertheless he testified: "but they all did it more or less." The testimony of witness McDaniel tended to rebut this testimony and was also competent for that reason.

The jury under the instructions of the court could not have rendered a verdict in favor of appellees unless they found that appellant was not an innocent purchaser for value. Therefore, since the verdict was in favor of appellees, the jury must have found that appellant was not a *bona fide* holder for value. That left the issue raised by appellees' answer as to whether they had good defenses to the notes as against the payee. The appellant's abstract does not show that appellant denied the allegations of appellees' answer as to breach of warranty, failure of consideration, false representation, etc., and appellant did not adduce any testimony bearing on these issues.

The uncontroverted testimony of the appellees sustained the allegations of their answer on these issues and even though there might have been technical errors in some of the instructions on these issues the verdict as to these was nevertheless correct upon the pleadings and the undisputed evidence.

We therefore find no error prejudicial to appellant on this branch of the case.

The judgment in the whole case is free from prejudicial error and must therefore be affirmed.