OLD REPUBLIC INSURANCE COMPANY v. H. W. ALEXANDER

5-4772                                          436 S.W. 2d 829

Opinion Delivered January 27, 1969
[Rehearing denied March 3, 1969)]

1030

*Arnold, Hamilton & Streetman* for appellant.

*Drew & Holloway* for appellee.

JOHN A. FOGLEMAN, Justice.  Appellant seeks reversal of a decree refusing rescission of an accident insurance policy issued by it to appellee and granting judgment in favor of appellee for the accidental loss of a foot.  Determination of the appeal depends on the propriety of the chancellor's finding that recovery was not barred by any misrepresentation, concealment or omissions by appellee.  We find no reversible error in the chancellor's decree.

Appellee Alexander applied for the policy of accident indemnity insurance in October 1966.  He suffered the loss of his left leg below the knee by reason of an accidental gunshot would to the left foot in December 1966.  When a claim was asserted, appellant instituted this action for rescission of the contract on the grounds that issuance of the policy was based on misrepresentation, misstatement and omission of facts in the application therefor.  Appellee counterclaimed for benefits

for loss of a limb as a result of an accidental gunshot wound.

Appellant contends that the decree of the chancellor should be reversed because of misrepresentation, omissions and concealment of facts, and incorrect statements by appellee which were material to the acceptance of the risk and because it would, in good faith, not have issued the policy if the true facts had been known to it. Appellant relies on the failure of Alexander to disclose previous diagnosis of heart disease and failure to mention exploratory heart surgery to support this contention.

The application was filled out by Alexander himself. The material portions thereof were as follows:

To the best of your knowledge and belief, have you ever had. (answer Yes or No to each question)—

An operation? *Yes* Epilepsy? *No* Syphilis? *No* Ulcer? *No* Diabetes? *No* Rheumatism or Arthritis? *No* Rheumatic Fever? *No* Disease of or Injury to the Back? *No* Heart Trouble? *No* Hernia? *No* Tuberculosis? *No* Deformity? *No* Loss of Eye or Limb? *Yes* Goiter or any Thyroid Disturbance? *No* Fainting Spells or Dizziness? *No* High or Low Blood Pressure? *No* Gall Bladder or Kidney Trouble? *No* Mental or Nervous Illness? *No* Give details of any of the above answered Yes — Date, duration, names and addresses of physicians and hospitals.

What claims, if any, have you ever made for injury or sickness? Specify dates, companies, amounts, nature of illness, or injury, degree of recovery— *Kidney stone Removed Bon. Hosp. 1-2-60 Freedom Ins.*
*12-19-59 Loss of Hand Hunting accident Dr. Burge Lamar Ins.*

United States Navy Department records indicate that an electrocardiogram given Alexander April 15, 1928, was essentially negative and that he had no heart lesion on June 7, 1928.    Later, an electrocardiogram administered to Alexander suggested some myocardial changes.    He was discharged on December 13, 1928, with a diagnosis of chronic myocarditis.  Navy medical reports indicate that Alexander had been first treated on an original diagnosis of malaria, but that subsequent tests for this disease were repeatedly negative.    These records also indicate that Navy medical authorities believed Alexander had tuberculosis at the time of his discharge, in spite of repeated negative results of tests and x-rays examination.

It was also shown that Alexander had undergone surgery consisting of exploratory paricardotomy, exploratory thoracotomy, and biopsy of a lung, in Denver in September 1954, after a pre-operative or provisional diagnosis of constrictive pericarditis.    The postoperative diagnosis was ''undetermined,'' and the final diagnosis was disseminated lupus erythematosus.    A diagnosis of mild pulmonary emphysema was made from the lung biopsy.    The medical reports indicate that the surgical exploration revealed no indication of pericarditis.    Alexander testified that the surgeon had told him after the operation there was nothing wrong with his heart.

Other hospital reports record a previous diagnosis of myocarditis as medical history.    An inference might well be drawn that Alexander furnished the information upon which these records were made.

Appellant relies heavily upon the failure of Alexander to respond affirmatively to the interrogatory in his application relating to heart trouble.    We find no basis for their contention in this respect. The evidence does not disclose any misrepresentation, omission, concealment or incorrect statements on the part of Alex-

ander in answering this question in the negative. The application required a "yes" or "no" answer to a question which asked the applicant to state, to the best of his *knowledge* and *belief*, whether he had ever had certain diseases including heart trouble. Although there is no doubt that previous diagnoses had indicated that Alexander might have had heart trouble of some nature, the evidence relating to this exploratory heart surgery and testimony of Dr. Allen Talbott, who had been Alexander's physician since 1951, justify a finding that the previous diagnoses were erroneous. The application form did not ask the applicant to state whether he had ever been examined for heart trouble, whether he had been subjected to tests for heart disease or whether any diagnosis of heart trouble had ever been made. See *Reserve Life Ins. Co.* v. *Baker*, 245 Ark. 854, S.W. 2d. We take the term "heart trouble" to be the equivalent of "heart disease." See *Webster's New International Dictionary*, Second Edition. Dr. Talbott's testimony, after he had been examined extensively with reference to previous diagnoses indicating Alexander had myocar ditis or pericarditis and with reference to the surgery performed in Denver, was that Alexander had not ever had heart trouble, to his knowledge. He further testified that the reports of the heart surgeon in Denver indicated that Alexander's heart was perfectly normal, that there had been no evidence of heart disease since that surgery, and that it is very likely that Alexander would not have been living at the time of trial if he actually had had the heart condition suspected when the surgery was performed. In view of this testimony, the answer given by Alexander as to his knowledge and belief cannot be said to have been incorrect.

Where, as here, answers are not warranties, an applicant for insurance is not required to enlarge upon the interrogatories in an application nor to interpret them in any sense other than that which the language employed and the circumstance of the inquiry suggest. *Federal Life Insurance Company* v. *Hase*, 193 Ark. 816,

102 S.W. 2d 841.   In the opinion in that case, Cooley's *Briefs on Insurance* was quoted to the effect that a mere layman cannot be presumed to know the existence of a disease which a physician cannot discover, or about which physicians differ in opinion.

Another basis of appellant's argument that rescission should be granted is that Alexander's failure to disclose the surgery he underwent in Denver in 1954 was a concealment or omission, under provisions of Ark. Stat. Ann. § 66-3208 (Repl. 1966).   Furthermore appellant says that the concealment or omission was material to the risk assumed by it, and such that it in good faith would not have accepted the risk if correctly apprised of the facts.

The application does show that Alexander failed to disclose this surgery.   In his testimony during the trial, he said that he did not notice the inquiry as to details relating to operations when he filled out the application.   If we assume that this was a concealment or omission sufficient to constitute a defense to the counterclaim or justifying rescission, still we cannot say as a matter of law that the fact that Alexander had this surgery was material to the risk.   The materiality to the risk of a fact misrepresented, omitted or concealed is a question of fact so long as the matter is debatable. It is a question of law only when so obvious that a contrary inference is not permissible.   *Union Trust Co. of Maryland* v. *Kansas City Life Insurance Company,* 300 F. 2d 606 (4th Cir. 1962), *National Security Ins. Co.* v. *Tellis,* 39 Ala. App. 445, 104 So. 2d 483 (1958) ; *Prudential Insurance of America* v. *Gourley,* 267 F. 2d 156 (5th Cir. 1959) ; *Metropolitan Life Ins. Co.* v. *Milton,* 74 Ga. App. 160, 38 S.E. 2d 885 (1946) ; *Blazek* b. *North American Life & Casualty Company,* 251 Minn. 130, 87 N.W. 2d 36 (1957) ; *Sullivan* v. *John Hancock Mutual Life Insurance Co.,* 342 Mass. 649, 174 N.E. 2d 771 (1961) ; *Mooney* v. *Underwriters at Lloyd's,* 33 Ill. 566, 213 N.E. 2d 283 (1966).   This principle is applied to questions

pertaining to acceptance of the risk as well as to those relating to the hazard assumed. *National Casualty Co. v. Johnson*, 219 Miss. 1, 67 So. 2d 865 (1953).

The burden was on appellant to sustain its contentions that the facts not disclosed were material to the risk assumed by it, or that, it in good faith, would not have issued the policy. To sustain this burden, appellant offered the testimony of the underwriter for its general agent. This underwriter stated that he had responsibility for acceptance or rejection of all health and accident insurance applications submitted to appellant since 1963. He stated that if Alexander's application had shown that he had been treated for heart trouble in the Navy for myocarditis or operated on in 1954 for suspected constricted pericarditis, it would not have been accepted. The witness' answers to questions relating to materiality to the risk and underwriting practices were as follows:

Q. With specific reference to heart conditions, what is the—does the company, and do you, as its underwriting agency, have any policy with respect to the acceptance of heart cases, or suspective heart cases, for health and accident insurance?

A. Yes, we do.

Q. What is that policy?

A. We do not issue the policy. —On applications, where there is suspective or heart conditions acknowledged.

Q. What is the reason for that policy of the company?

A. We feel that a person with a heart condition could become involved in an accident where we

would have extreme difficulties trying to prove that death occurred through natural causes or that death occurred as a result of the accident. So, we do not want to put ourselves in the position of having to determine that.

Q. Is this type of insurance a low premium low income type insurance so far as the company is concerned?

A. Yes sir.

Q. From an underwriter's standpoint, in determining whether or not the coverage would be accepted, is it material that the insurance applicant indicate whether or not he has had any previous medical treatment or surgery involving chest or heart surgery?

A. Yes, it is.

In support of his testimony, the underwriter introduced 54 applicants for accidental indemnity insurance rejected by him. Among these were some cases where applications indicated previous heart disease from which there had been full recovery, blood pressure variations, possible heart trouble, high blood pressure, or slight heart trouble. No applications for policies which were accepted were offered, and it is not shown whether appellant accepted risks of this nature on other applications.

As pointed out by the chancellor in his comprehensive opinion, the failure of Alexander to fill in the blank provided for details as to operations was obvious. Alexander admitted in a discovery deposition that it was his intention to utilize the space following the inquiry about claims for previous injuries or sickness to answer that question as well as the preceding one about surgery details. The underwriter stated that he so treated the

application. Even so, the manner of handling the application is not wholly consistent with appellant's present contentions. Not only was there no further inquiry about this obvious deficiency in the application before the underwriter reached his conclusion as to the applicant's intention, but it seems that this application was treated differently from the usual one. Appellant's underwriter testified that an exception was made in the acceptance of the application because Alexander worked for one of appellant's agents in spite of the fact that he had been rejected by other insurance companies. Included in the examples of rejections introduced through him, are several over the signature of the witness that indicate rather flexible underwriting standards in cases such as this. For example:

"After reviewing your application for this coverage we very much regret that because of your past medical history and that both you and your wife's ages exceed our underwriting limits, we cannot issue the policy. For your information we generally restrict coverage to white collar occupations in the age group of 18 through 65."

"As you know, we *normally* decline requests for this coverage received from people with coronary histories. Mr. Tanner stated on his application that he had a heart attack in May, 1965. Therefore, would it be possible for you to obtain the Attending Physician's Statement concerning this illness. This should include copies of any EKG's chest X-Rays, etc."

(This application was rejected after the applicant was described as "worse than the average coronary risk.")

"To begin, please understand that if I bent any underwriting rule, it would be for you because of our long and most pleasant business association.

In this instance, I discussed your client's heart condition with our Medical Director before declining the application. It was his opinion from a medical position, we should not write the policy. Further, it was doubted that your client could pass future FAA medical examinations. This, of course, is between ourselves and should not be discussed with the client."

(This applicant stated that he had made possibly one claim per year for sickness or injury for the last 10 years.)

"Don, I am aware of Mr. Clark being one of your preferred clients and *was willing to bend every rule in the underwriting book* to issue this coverage. I discussed this case with our medical director and it was his opinion we again reject Mr. Clark's application due to his previous medical history."

"Your client stated in his application that he had a light coronary in 1960. While we would *normally* reject his application because of this, as a favor to you, we promise to explore every possibility of issuing the policy. Would you kindly have the attached Special Coronary Questionnaire completed and returned to us as quickly as possible."

"Our underwriting regulations *normally* do not permit us to issue policies on individuals having a past history of heart trouble."

"*Normally,* your blood pressure problem would prohibit us from issuing any form of accident coverage, but because you were formally one of our policy holders, *we might be willing to make an exception in your case.* Would you kindly obtain a statement from your physician, outlining your present state of health, with particular attention to the

blood pressure problem. Copies of any recent electrocardiograms would be extremely helpful.''

(All emphasis ours.)

It is significant, as pointed out by the chancellor, that appellant produced no record of its own underwriting standards, nor did it attempt to show general standards in the underwriting profession or insurance trade by disinterested witnesses. It relied solely on the retrospective and possibly self-serving declarations of conclusions by this witness. It would be only natural if such a witness were subconsciously influenced by the defensive mechanism possessed by human beings to forestall criticism of his underwriting decision. At any rate, his testimony cannot be considered as that of a disinterested witness. In weighing testimony, courts must consider the interest of a witness in the matter in controversy. *Wasson* v. *Lightle,* 188 Ark. 440, 66 S.W. 2d 652. Facts established by the testimony of an interested witness, or one whose testimony might be biased, cannot be considered as undisputed or uncontradicted. *Sykes* v. *Carmack,* 211 Ark. 828, 202 S.W. 2d 761; *Skillern* v. *Baker,* 82 Ark. 86, 100 S.W. 764. While the testimony of such a witness may not be arbitrarily disregarded, a trier of facts is not required to accept any statement as true merely because so testified. *St. Louis-San Francisco Ry. Co.* v. *Grant,* 185 Ark. 222, 46 S.W. 2d 640. It cannot be said that such testimony is arbitrarily disregarded when it is not consistent with other evidence in the case, or unreasonable in its nature or is contradicted. *St. Louis-San Francisco Ry. Co.* v. *Grant,* supra; *Sykes* v. *Carmack,* supra. Nor is it arbitrarily disregarded where facts are shown which might bias the testimony or from which an inference may be drawn unfavorable to the witness' testimony or against the fact testified to by him. *Missouri Pacific Railroad Co.* v. *Trotter,* 184 Ark. 790, 43 S.W. 2d 762; *Bullock* v. *Miner,* 225 Ark. 897, 286 S.W. 2d 328. When the conduct of any witness is clearly inconsistent with his tes-

timony and not satisfactorily explained, the trier of facts is justified in disbelieving the testimony. *Feild* v. *Koonce,* 178 Ark. 862, 12 S.W. 2d 772. In the opinion in the cited case, we quoted from 2 *Moore on Facts* § 1136, where Lord Stowell was, in turn, quoted as follows:

> "* * * 'I am not deaf to the fair pretensions of human testimony, but at the same time I cannot shut my senses against the ordinary course of human conduct. Conduct of a witness clearly inconsistent with his testimony and not satisfactorily explained is one of the most fatal species of impeachment; because the trier of facts is thus justified in disbelieving the testimony without in any degree reflecting upon the integrity of the witness, who, it may be presumed, is a victim of the proverbial fickleness of memory—especially after considerable time has elapsed—or of various perturbing psychological influences which affect men of the highest probity as well as those of indifferent moral natures and operate with peculiar force if the witness is interested or otherwise biased.' "

These principles are applicable where the issue of fact, upon which the testimony is given, is the good faith of one of the parties. *Holland Banking Co.* v. *Booth,* 121 Ark. 171, 180 S.W. 978.

The chancellor did not consider the underwriter's testimony on the question of materiality to the risk and rejected it on the issue of good faith. We cannot say that he was not justified in so doing. When we consider that appellant had the burden of proving that the omitted or concealed facts were material to the risk, or that it, in good faith, would not have issued the policy, the facts indicating possible bias in the testimony of the underwriter, the possibility of drawing inferences from the conduct of the underwriter in making exceptions inconsistent with the underwriting practices about which

he testified, and the retrospective nature of the testimony, we cannot say that the findings of the trial judge are against the preponderance of the evidence.

Appellant also contends that the attorney's fee of $6,000 allowed by the trial court was exorbitantly excessive. It correctly states that the fee contemplated is not a speculative or contingent fee but such a fee as would be reasonable for a litigant to pay his attorney for prosecuting such a case. It is not correct, however, as suggested by appellant that the mere time involved is the only factor to be considered. The purpose of the statute allowing recovery of attorney's fees is to permit an insured to obtain the services of a competent attorney. *Mutual Life Ins. Co. of New York v. Owen*, 111 Ark. 554, 164 S.W. 720. The amount of the fee allowed should be such that well prepared attorneys will not avoid this class of litigation or fail to devote sufficient time for thorough preparation. It should not only be commensurate with the time and amount of work required but also with the ability present and necessary to meet the issues that arise. *John Hancock Mutual Life Insurance Company v. Magers,* 199 Ark. 104, 132 S.W. 2d 841. Also, we have often considered the sum recovered or the amount involved in an action in allowing fees or in considering fees allowed by trial courts. See e.g., *Old Colony Life Ins. Co. v. Julian*, 175 Ark. 359, 299 S.W. 366; *American National Ins. Co. v. Westerfield*, 189 Ark. 476, 73 S.W. 2d 155; *Commercial Union Assurance Co. v. Leftwich,* 191 Ark. 656, 87 S.W. 2d 55; *New York Life Insurance Co. v. Thweatt,* 221 Ark. 478, 254 S.W. 2d 68. The statute requires that we do so in cases, such as this, where the insurance company brings suit to cancel a policy. Ark. Stat. Ann. § 66-3239 (Repl. 1966). It is also appropriate that consideration be given to the trial judge's acquaintance with the record and the quality of service rendered in the case. *American Equitable Assur. Co. of New York v. Showers,* 195 Ark. 521, 113 S.W. 2d 91. When we consider from an inspection of the record the nature of

the cause, the novelty of some of the questions presented, the heat of the contest, the time necessary for preparation of the case, the standing and ability of the attorneys on both sides, and the knowledge of the trial court of the nature and extent of the services rendered, we cannot say that this allowance on a recovery of $51,000 and interest was excessive.

Appellee took a cross-appeal from the action of the trial court allowing interest from May 1, 1967, the date on which appellant refused to pay appellee's claim. He contends that interest should run from February 17, 1967, 60 days after the loss occurred. Interest accrues as a matter of law from the date the amount due became payable under the policy. *Missouri State Life Ins. Co.* v. *Fodrea,* 185 Ark. 155, 46 S.W. 2d 638; *Hartford Fire Insurance Co.* v. *Enoch,* 79 Ark. 475, 96 S.W. 393; *Phoenix Ins. Co.* v. *Public Parks Amusement Co.,* 63 Ark. 187, 37 S.W. 959; *Southern Insurance Co.* v. *White,* 58 Ark. 277, 24 S.W. 425. The policy provides that indemnities such as this will be paid immediately upon receipt of proof of loss. It also contains a clause prohibiting the bringing of any action on the policy prior to the expiration of 60 days after proof of loss has been furnished. The allowance of interest from a date about 60 days later than the date on which the proof was submitted has been held to allow a reasonable and sufficient time for payment. *American National Insurance Co.* v. *Westerfield,* 189 Ark. 476, 73 S.W. 2d 155. Appellee was entitled to interest beginning 60 days after the submission of proof of loss, at the latest.

Appellee prays for the allowance of additional attorney's fees on this appeal. After considering the fee allowed by the trial court, the briefs filed here, the oral arguments made, and other factors proper for consideration, appellee is allowed an additional sum of $1,500 for attorney's fees on this appeal.

The judgment is affirmed on appeal and reversed on cross-appeal. The judgment is modified to provide

for interest on the $51,000 recovery from the 17th day of February, 1967.

HOLT, J., not participating.

HARRIS, C.J., and GEORGE ROSE SMITH, J., concur.

GEORGE ROSE SMITH, J., concurring. This litigation involves two distinct causes of action: First, the insurer's suit to rescind the policy for misrepresentations by the insured in his application for the policy; second, the insured's counterclaim for the $50,000 indemnity for the loss of his leg in a hunting accident. The majority opinion seems to imply, or at least it can be understood to mean, that the insurance company would have prevailed upon *both* causes of action had it succeeded in proving that Alexander concealed the existence of heart trouble when he applied for the policy. I write these concurring remarks to make it clear that I do not join in that view, because in any event I would affirm Alexander's judgment upon his counterclaim.

My reasoning is simple. According to the proof, the condition of Alexander's heart had nothing whatever to do with his shooting himself in the leg. I do not construe the Insurance Code to mean than an insurance company, after a loss has occurred, can refuse to pay the claim on the ground that the application for the policy contained a misrepresentation about some fact that had absolutely no causal connection with the actual loss. Such a construction of the Code would encourage *ex post facto* litigation and would provide insurers with a windfall amounting to unjust enrichment.

To me the statute is clear. Section 275 of the Code reads in part:

> Misrepresentations, omissions, concealment of facts, and incorrect statements *shall not prevent a recovery* [my italics] under the policy or contract unless either:

(a)   Fraudulent; or

(b)   Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c)   The insurer in good faith [would not have issued the policy that it did issue] if the true facts had been known... [Ark. Stat. Ann. § 66-3208 (Repl. 1966).]

All the statute says is that misrepresentations and the like ''shall not prevent a recovery'' unless they are fraudulent, material, and so forth.   Such a statement merely provides a minimum prerequisite to the insurer's successful defense; that is, the misrepresentation must have been fraudulent, material, etc.   That is by no means the equivalent of saying that *every* fraudulent or material misrepresentation shall *ipso facto* prevent a recovery.   To illustrate, a statute which provides that no contract shall be enforceable unless it is in writing certainly does not mean that *every* contract which is in writing is thereby necessarily enforceable.

To construe the statute more narrowly than I am suggesting runs counter to common sense and justice. Suppose, for example, that the insured fails to mention in his application a stomach ulcer that was treated with complete success.   A year and a half later, within the period of contestability, he is instantly killed by lightning.   Surely the legislature did not mean to enable the insurance company to defeat a recovery upon the policy by dredging up the irrelevant and harmless misstatement about the stomach condition.   Such an interpretation of the Code would permit the insurer to repudiate the policy whenever a loss occurred but to pocket the premiums with impunity when the policy proved to be of no value to the insured or his beneficiaries.

I should add that I do not consider our holding in *Dopson* v. *Metropolitan Life Ins. Co.*, 244 Ark. 659, 426

S.W. 2d 410 (1968), to be contrary to this concurring opinion. There the applicant concealed an earlier instance of back trouble, and the claim that was asserted in the case was for hospitalization due to a back problem. Hence the necessary causal connection between the misrepresentation and the loss was shown to exist.

HARRIS, C.J., joins in this concurrence.