CAPITOL LIFE and ACCIDENT INSURANCE COMPANY
*v.* Lela K. PHELPS

CA 01-769 66 S.W.3d 678

Court of Appeals of Arkansas
Division II
Opinion delivered February 13, 2002

*Mitchell, Williams, Selig, Gates & Woodyard P.L.L.C.*, by: *Byron Freeland* and *Leigh Ann Shults*, for appellant.

*Walters, Hamby & Verkamp*, by: *Bill Walters*, for appellee.

TERRY CRABTREE, Judge. Appellant, Capitol Life and Accident Insurance Company (Capitol), appeals the denial of its claim for rescission of three credit-life policies issued to the late Lincoln Phelps and a subsequent judgment in favor of Phelps's widow, appellee Lela Phelps. This is the third time this case has been before us. On the first occasion, we reversed a circuit court jury verdict in favor of appellee and instructed that the case be transferred to chancery. *See Capitol Life & Accident Ins. Co. v. Phelps*, No. CA98-1495 (June 2, 1999). Following a trial in chancery court, which also resulted in a verdict in favor of appellee, another appeal was taken by Capitol. We dismissed that appeal for lack of finality. *See Capitol Life & Accident Ins. Co. v. Phelps*, 72 Ark. App. 464, 37 S.W.3d 692 (2001). Thereafter, a final order was entered by the chancellor, and this appeal was brought. We are able to reach the merits on this appeal, and we affirm the chancellor's decision.

Between October 24, 1995, and March 8, 1996, Lincoln Phelps submitted applications to appellant for three credit life policies. Each application contained the following language:

I VOLUNTARILY REQUEST THE INSURANCE DESCRIBED IN THIS POLICY. I . . . AM . . . NOW IN GOOD HEALTH, MENTALLY AND PHYSICALLY, AND HAVE NO CHRONIC DISEASE OR POOR HEALTH CONDITION.

The applications were signed by Phelps and forwarded to appellant, who then issued policies in the amounts of $21,107.07, $6,690.22, and $24,812.78, for a total of $52,610.07.

On September 13, 1996, while all three policies were in effect, Lincoln Phelps died at age fifty-four. His death certificate listed the cause of death as acute myocardial infarction due to cardiac dysrhythmia. Appellee Lela Phelps, as executrix of her husband's estate, submitted claims to appellant on all three policies, but the claims were denied. Following that denial, Mrs. Phelps sued appellant seeking the policy proceeds, plus a twelve-percent penalty, interest, and attorney fees, pursuant to Arkansas Code Annotated section 23-79-208 (Repl. 1999). Appellant counterclaimed for rescission on the grounds that Phelps had misrepresented his health as being good when in fact it was not, and further, had appellant known the true state of Phelps's health, it would not have issued the policies.

On January 18, 2000, a trial was held in chancery court. Appellee presented the testimony of herself and others that Lincoln Phelps had always been a vigorous, hard-working man with no visible health problems. The evidence was undisputed that Phelps consistently worked at hard physical labor for up to twelve hours a day, rarely missed work due to illness, had not been hospitalized in the twenty years preceding his death, and gave no outward indication of being in anything other than good health. Appellant, however, introduced Phelps's medical records into evidence, and they revealed that, at various times during the twenty years preceding his death, Phelps had been diagnosed with Graves disease (a thyroid disorder), hypertension, atrial fibrillation, and a mitral valve insufficiency. Appellant's vice-president, Paul Eaton, testified that, had appellant known of the health problems reflected in those records, it would not have issued the policies.

Following the trial, the chancellor ruled that the terms "good health" and "poor health condition" in the policy applications were ambiguous and that the term "chronic disease" while not ambiguous, was unclear. He also stated that "the Court cannot answer the question that [Phelps's alleged misrepresentation] was material to

the denial. Mr. Eaton, testifying for the insurance company, states [that] they would not have issued the policy, but his testimony is after the fact." Based upon these findings, the chancellor denied appellant's request to rescind the policies and entered judgment for appellee in the amount of $52,610.01. He also awarded appellee a twelve percent penalty, prejudgment interest, attorney fees, costs, and post-judgment interest, for a total judgment of $121,037.11. The appeal is brought from that order.

■■ Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent recovery under an insurance policy unless either: 1) fraudulent; 2) material to either the acceptance of the risk or to the hazard assumed by the insurer; or 3) the insurer in good faith would not have issued the policy, or would not have issued it in the same amount, or at the same premium rate, or would not have provided coverage with respect to the hazard resulting in the loss if the facts had been made known to the insurer as required by the application for the policy. *See* Ark. Code Ann. § 23-79-107(a) (Repl. 1999). Appellant does not contend that Phelps fraudulently misrepresented the state of his health, but argues that Phelps's incorrect statement of good health was material to its acceptance of the risk and that, had it known the true facts, it would not have issued the policy. This is an affirmative defense that an insurer must plead and prove by a preponderance of the evidence. *See American Family Life Assurance Co. v. Reeves*, 248 Ark. 1303, 455 S.W.2d 932 (1970).

■ In deciding appeals from a chancery court, we review the evidence *de novo* and reverse only if the chancellor's findings are clearly erroneous. *Morse v. Morse*, 60 Ark. App. 215, 961 S.W.2d 777 (1998). Further, we give great deference to the chancellor's superior position to determine the credibility of witnesses and the weight to be accorded their testimony. *Simmons First Bank v. Bob Callahan Servs., Inc.*, 340 Ark. 692, 13 S.W.3d 570 (2000).

■ Appellant first challenges the chancellor's ruling that the language in the applications was ambiguous. An ambiguity exists when a provision in a policy or application is susceptible to more than one reasonable interpretation. *Phelps v. U.S. Credit Life Ins. Co.*, 336 Ark. 257, 984 S.W.2d 425 (1999).

■ The supreme court has defined the term "good health" as used in this context to mean that an applicant is in "apparent good health and free from such diseases as would seriously affect the risk." *Union Life Ins. Co. v. Davis*, 247 Ark. 1054, 1059, 449 S.W.2d

192, 195 (1970). The court further qualified that definition, stating that the applicant "must be justified in the belief that he is free of symptoms which should cause reasonable apprehension of disease which would materially affect the risk." *Id.* at 1060, 449 S.W.2d at 195. Based upon the fact that Phelps was virtually asymptomatic and able to lead a normal — if not more vigorous than normal — life, it is likely that he was justified in believing himself to be in good health. However, we need not address that point. Even if the application language was unambiguous, and even if Phelps incorrectly represented the state of his health, appellant could not void the policy unless it proved, pursuant to Ark. Code Ann. § 23-79-107(a), that the misrepresentation was material to its acceptance of the risk or that it would not have issued the policy had it known the true facts. The chancellor found that appellant's proof on this point was not convincing, and we cannot say that such a finding was clearly erroneous.

■ The burden was on appellant to sustain its contention that the facts not disclosed were material to the risk assumed by it or that, in good faith, it would not have issued the policy. *See Old Republic Ins. Co. v. Alexander,* 245 Ark. 1029, 436 S.W.2d 829 (1969). Appellant's vice-president Paul Eaton testified without elaboration that, if appellant had known of Phelps's health problems, it would not have issued the policies. However, Eaton offered no proof of any underwriting practices either in his own company or within the industry with regard to applicants with the type of health conditions reflected in Phelps's records. The only concrete underwriting guidelines introduced into evidence were those that required an applicant to fill out a detailed health certificate based on certain age, policy term, and amount of loan criteria. Those guidelines did not apply to Phelps, who was fifty-three at the time of his application and whose policies were valued at less than $75,000 for only a one-year term.

■ As the supreme court recognized in *Old Republic Ins. Co. v. Alexander, supra*:

> It is significant, as pointed out by the chancellor, that appellant produced no record of its own underwriting standards, nor did it attempt to show general standards in the underwriting profession or insurance trade by disinterested witnesses. It relied solely on the retrospective and possibly self-serving declarations of conclusions by this witness . . . his testimony cannot be considered as that of a disinterested witness. In weighing testimony, courts must consider

the interest of a witness in the matter in controversy. Facts established by the testimony of an interested witness, or one whose testimony might be biased, cannot be considered as undisputed or uncontradicted. While the testimony of such a witness may not be arbitrarily disregarded, a trier of facts is not required to accept any statement as true merely because so testified. It cannot be said that such testimony is arbitrarily disregarded when it is not consistent with other evidence in the case, or unreasonable in its nature or is contradicted. Nor is it arbitrarily disregarded where facts are shown which might bias the testimony or from which an inference may be drawn unfavorable to the witness' testimony or against the fact testified to by him. (Citations omitted).

*Id.* at 1039, 436 S.W.2d at 835-36. *See also Wittner v. IDS Ins. Co. of N.Y.*, 96 A.D.2d 1053, 466 N.Y.S.2d 480 (1983); 44 AM. JUR. 2D Insurance § 1957 (2d ed. 1982) (holding that insurer's testimony on whether policy would have been issued is acceptable evidence, but not conclusive).

■ The chancellor in the case before us did not accept the testimony of appellant's representative that appellant would not have issued the policy had it known of Phelps's health conditions. Given the conclusory nature of the representative's testimony and the lack of supporting documentation, we cannot say that the chancellor clearly erred.[1]

The final issue concerns the amount of attorney fees awarded to appellee by the chancellor. The chancellor awarded $30,589.86 in fees, which was forty percent of the amount recovered by appellee under the policies, plus penalty and prejudgment interest. In her motion for fees, appellee stated that her agreement with her counsel was that, if the case should be appealed, counsel would be entitled to forty percent of the amount recovered. She also claimed that her counsel had spent over 350 hours on the case, although the itemized statement she attached showed only the activity entries, not the time spent.

---

[1] Appellant makes a brief argument that Phelps's misrepresentation was material because Phelps's death was causally related to the matters misrepresented. *See* Ark. Code Ann. § 23-79-107(c) (Repl. 1999), which provides that "a misrepresentation is material if there is a causal relationship between the misrepresentation and the hazard resulting in a loss under the policy or contract." The chancellor made no ruling on the connection between Phelps's death and the conditions listed in his medical reports but, in any event, the evidence was in dispute on this point.

 Arkansas Code Annotated section 23-79-208(a) (Repl. 1999) provides that an insured may recover a reasonable attorney fee from an insurer who wrongfully refuses to pay on a policy. *Phelps v. U.S. Credit Life Ins. Co.*, 340 Ark. 439, 10 S.W.3d 854 (2000). The following factors are relevant in determining reasonable fees: 1) the experience and ability of the attorney; 2) the time and labor required to perform the service properly; 3) the amount in controversy and the result obtained in the case; 4) the novelty and difficulty of the issues involved; 5) the fee customarily charged for similar services in the local area; 6) whether the fee is fixed or contingent; 7) the time limitations imposed upon the client in the circumstances; and 8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the attorney. *Id.* However, while the courts should be guided by the foregoing factors, there is no fixed formula in determining the reasonableness of an award of attorney fees. *Id.* Because of its intimate acquaintance with the record and the quality of service rendered, we recognize the superior perspective of the trial court in assessing the applicable factors. *Id.* Thus, we will not set aside an award of attorney fees absent an abuse of discretion by the trial court. *Id.*

 In *Phelps v. U.S. Credit Life Insurance Company, supra,* we approved an attorney fee award based upon a one-third contingency fee arrangement. Considering that this case has been tried twice and appealed three times, we see no abuse of discretion in the award in this case.

Affirmed.

STROUD, C.J., and JENNINGS, J., agree.