620

## MOTORS INSURANCE CORPORATION *v.*
### Earl TINKLE

5-6091                                              488 S.W. 2d 23

Opinion delivered December 18, 1972

*Barber, Henry, Thurman, McCaskill & Amsler,* by: *Guy Amsler Jr.,* for appellant.

*Howell, Price, Howell & Barron,* by: *Richard J. Orintas,* for appellee.

Carleton Harris, Chief Justice. This is an appeal by Motors Insurance Corporation, appellant herein, from a judgment entered against it by the Pulaski County Circuit Court (Third Division) sitting as a jury, in favor of Earl Tinkle, appellee herein, allowing recovery under a physical damage automobile insurance policy

for theft of a 1969 Chevrolet one-half ton pickup truck. The truck was stolen from the premises of Waldon Tinkle, a son of appellee. For reversal, it is simply contended that the findings of the trial court are not supported by substantial evidence, and a verdict should have been rendered for the appellant; actually, it is asserted that the owner and principal driver of the vehicle was misrepresented in the application for the insurance; that this was a material misrepresentation and the company would not have issued the policy had it known otherwise.

On February 7, 1969, the company issued to appellee the aforementioned insurance policy, the truck being purchased in Little Rock and selected by Waldon Tinkle, a son of the insured; the truck and transaction papers were then taken to the home of Earl Tinkle and executed by him. A 1962 truck, belonging to Waldon, was traded in on the 1969 vehicle. Earl Tinkle, 69 years of age, testified that he lived on the Billy Dale Milk Farm at Sweethome, and that he bought the truck from Cliff Peck Chevrolet Company, a salesman coming to his home, together with his son to explain the transaction. He said that he and his wife furnished the money for the payments on the truck but that Waldon frequently made the payments for him after the son had been given the money by the father. Appellee stated that he worked seven days a week, and found it difficult to get off from work in order to make the payments himself. The elder Tinkle said that his son did use the truck part of the time, though he testified that he kept the vehicle the "biggest part" of the time at his home. Tinkle said that Waldon was given the authority to use the truck whenever he needed it; that on the particular day before it was stolen, the truck was at his house during the morning and Waldon borrowed it that afternoon and took it to his home. Appellee was unable to state exactly how often he would use the truck but said that he used it "once, twice or three times a week maybe". On cross-examination, it was developed that when Tinkle's discovery deposition was taken, appellee had stated that he did not use the truck too often, and when asked how

often, replied "Oh, whenever I would go out and get some feed, about once a week".

The truck, at the time it was stolen, was at the home of Waldon and his wife, Margaret. The latter testified that when she got ready to go to work (sometime after 7:00 a.m.), she noticed that the truck was gone and after awakening her husband, went to a service station and reported to the police that it was stolen.[1] Bill Blassingame, employed by the Pulaski County Sheriff, testified that he received a report on May 8, 1970 (day the theft was discovered), that the truck was stolen from the yard of the Waldon Tinkle home and a description of the vehicle was given. He was under the impression that the theft had been reported by Mr. Waldon Tinkle rather than his wife, and that the report had been made by the "owner". The truck was recovered on December 4, 1970,[2] from a "blue hole"[3] on Arch Street Pike. Deputy Sheriff Ben Crane testified as to the following events occurring on December 4:

> "Officer Presley and myself received a call late that afternoon that they were pumping water out of this hole out there and someone had saw the image of the truck in the water. We got out there, we couldn't see it, so we called for a wrecker and the wrecker was sent out there and it was out in the water approximately seventy five feet and it was hooked onto and pulled out up to the bank, it was muddy twenty five or thirty feet from the original bank, and they washed off the license number and gave it to me. I went to the car and radioed the license number and description of the truck to Officer Blankinship and he checked and, of course, it was stolen."

Waldon Tinkle testified that he used the vehicle in

---

[1] There was no telephone at the house.

[2] A brother of Waldon's, Bill Tinkle, operated a salvage yard and, at public auction, purchased the truck from the company that had towed it in after it was found.

[3] A "blue hole" is a pit that has been formed by mining for bauxite, and has become filled with water.

his work once or twice a week; that generally it stayed at his father's house, and that he always obtained his father's permission before using it. He said that he reported the loss to Motors Insurance Corporation on the authority of his father, and on the same day the vehicle was stolen, he leased another vehicle on behalf of Earl Tinkle from Cliff Peck Chevrolet, this being done after he learned that under provisions of the policy, rental of a replacement would be allowed for thirty days. He said that he borrowed the truck from his father the afternoon it was stolen; admittedly he made the truck payments most of the time, stating however that he was acting as agent for Earl Tinkle and that his father reimbursed him for all payments made. He said that the truck was used by his father and one of his older brothers, as well as himself.

Waldon testified that he had never been convicted of a felony, but had been arrested for car theft when he was sixteen years of age. He said that he was referred to the juvenile court, which released him on good behavior. It developed also that he had been charged on two subsequent occasions with car theft and had been placed on probation. These instances had occurred in 1962. At the time the instant theft was reported to the company, a statement was given in writing, in which statement Waldon testified that he purchased the truck, was the owner, and that normally he and his wife were the only operators.

James A. Halbert, a special agent[4] for Motors Insurance Corporation, but who at the time of the theft of the truck was an adjuster for appellant, investigated the claim. Halbert was the individual to whom Waldon Tinkle had given the written statement. Halbert had recommended denial of the claim and also had recommended voidance of the policy, and the company had followed his recommendations, notifying appellee on May 26, 1970, that the company was voiding the policy as of its inception date and was returning the premium

---

[4]The duties of special agent were not enumerated.

because Earl Tinkle was listed as the insured and only driver. Mr. Halbert testified that if Waldon Tinkle had been listed on the application as the owner or the principal operator of the truck, appellant would not have accepted him as a risk.

In rendering its verdict, the trial court found that the alleged false and fraudulent misrepresentations made by Earl Tinkle in obtaining the casualty insurance policy were not material to the risk and subsequent loss, and further, "the Court has not been convinced that the policy would not have been written had the defendant had available to it the information concerning Waldon Tinkle". Though the court made no finding that false statements had been made, such a finding might be implied from the findings that the court did make. Actually, there was also evidence to the contrary. As pointed out, both appellee and the son testified that the father (applicant for insurance) was the owner of the vehicle. Of course, Waldon originally gave a statement contrariwise but this statement did not constitute affirmative evidence and could only be used for impeachment purposes. *Chapman* v. *Henderson,* 188 Ark. 714, 67 S.W. 2d 570; *Thomas* v. *State,* 72 Ark. 582, 82 S.W. 202.

Appellee asserts that he had a right to rely on the definition of "insured" appearing in the policy, which reads as follows:

"Insured means
(a) with respect to an owned automobile,

(1) the named insured, and
(2) any person or organization (other than a person or organization employed or otherwise engaged in the automobile business or as a carrier or other bailee for hire) maintaining, using or having custody of said automobile with the permission of the named insured and within the scope of such permission."

As to the materiality of the misrepresentations, we agree that it was not established that the answer relative

to ownership was material.[5] The fact that Waldon had, some eight years earlier been involved with car thefts, and placed on probation, is apparently the principal basis for this contention, and appellant is arguing that had it known Waldon Tinkle was the actual owner or operator, because of this record, the policy of insurance would not have been issued. This argument, of course, presupposes that the company checks the records of all applicants to determine if they have a criminal record. This would appear to be necessary since the application itself contains no questions relative to prior arrests or convictions, other than traffic violations. But, even though this be true, we cannot, as a matter of law, hold that when an applicant for this type of insurance has a record, that fact in itself makes any misrepresentation material. Had Waldon Tinkle been convicted of defrauding an insurance company, appellant's argument would be much more potent. In *Old Republic Insurance Co. v. Alexander,* 245 Ark. 1029, 436 S.W. 2d 829, Alexander failed to disclose certain surgery and it was contended that the omission was material to the risk and that the company in good faith would not have accepted the risk if correctly apprised of the facts. We said:

> "If we assume that this was a concealment or omission sufficient to constitute a defense to the counterclaim or justifying rescission, still we cannot say as a matter of law that the fact that Alexander had this surgery was material to the risk. The materiality to the risk of a fact misrepresented, omitted or concealed is a question of fact so long as the matter is debatable. It is a question of law only when so obvious that a contrary inference is not permissible."

[5]Appellant cites Ark. Stat. Ann. § 66-3208 (Repl. 1966), which provides, *inter alia,* that misrepresentations, omissions, concealment of facts and incorrect statements with regard to the application shall not prevent a recovery under the policy unless fraudulent, material to the acceptance of the risk, or to the hazard assumed by the insurer, or the insurer in good faith would not have issued the policy. Appellee points out that this statute refers to only life or disability insurance and appellant responds that the statute was referred to in the opinion in *Old Republic Insurance Company v. Alexander,* 245 Ark. 1029 436 S.W. 2d 829 and treated as though applicable, though that particular contract involved an accident policy. It is not really necessary to discuss the apparent conflict in deciding the instant case.

The court also said that it had not been convinced that the policy would not have been written had the defendant had available to it the information concerning Waldon Tinkle. The testimony that the company would not have accepted the risk was given by Mr. Halbert. As pointed out by appellee, Halbert, now a special agent for the company, was a claim adjuster at the time he investigated the theft of this truck. As a claim adjuster, says appellee, he was not qualified to substantiate this affirmative defense. Mr. Halbert was an employee of the company but he mentioned no authority that he possessed to make a determination as to whether an application would be accepted. This is noticeable because in making his recommendation to deny the claim and void the policy, Halbert stated that "The decision to void or to do anything, of course, was not made by me". Appellant points out that this was the only testimony on the subject and that Mr. Halbert was "not even cross-examined on the point, let alone contradicted". It is true that normally some office official of the company, familiar with its underwriting practices, would be expected to testify but that is not the most important fact with regard to Halbert's testimony. Rather, Halbert had recommended that the claim be denied and that the policy be voided; in other words, from a legal standpoint, he had an interest in the case, an interest in trying to sustain his position. We have said many times that in weighing testimony, courts must consider the interest of a witness in the matter in controversy, and that a trier of facts is not required to accept any statement as true because merely so testified. Under our cases, Halbert was not a disinterested witness. In *Old Republic Insurance Co. v. Alexander, supra,* we said:

> "It is significant, as pointed out by the chancellor, that appellant produced no record of its own underwriting standards, nor did it attempt to show general standards in the underwriting profession or insurance trade by disinterested witnesses. It relied solely on the retrospective and possibly self-serving declarations of conclusions by this witness. It would be only natural if such a witness were subconsciously

influenced by the defensive mechanism possessed by human beings to forestall criticism of his under-writing decision. At any rate, his testimony cannot be considered as that of a disinterested witness."

In other words, Mr. Halbert's testimony cannot be taken as undisputed, and the trial court was not required to accept this evidence just because no contradictory evidence was offered. The law, under the circumstances does not consider it uncontradicted.

The two questions at issue in this litigation were both fact questions. It was within the power of the circuit court, sitting as a jury, to determine these fact questions.

Affirmed.