Rebecca COLLINS and Korey Collins  *v.*
Harold MORGAN

CA 04-1071                                      211 S.W.3d 14

Court of Appeals of Arkansas
Opinion delivered June 22, 2005

*Rogers Law Firm, P.A.*, by: *Edmundo G. Rogers*, for appellants.

*Benson & Wood, PLC,* by: *Joe Benson,* for appellee.

ANDREE LAYTON ROAF, Judge. This is a summary-judgment case. Appellants Rebecca and Korey Collins appeal from the trial court's grant of summary judgment in favor of appellee Harold Morgan. On appeal, the Collinses argue that the trial court erred in granting Morgan's motion for summary judgment. We agree and reverse and remand for a trial on the merits.

On July 9, 2003, Rebecca Collins filed a complaint in Washington County Circuit Court against Sandra Powell and Harold Morgan alleging causes of action for negligence and negligent entrustment. In her complaint, Rebecca alleged that, on July 11, 2000, she was a pedestrian in the Thrifty Rental Company parking lot in Springdale, Arkansas, when a car driven by Sandra Powell struck her and caused severe injuries; that the vehicle that Sandra was driving was owned by Harold Morgan; that Sandra operated the vehicle in a careless and negligent manner in violation of Ark. Code Ann. § 27-51-104 (Supp. 2003); and that Sandra was legally intoxicated at the time of the accident in violation of Ark. Code Ann. §§ 5-65-101 (Repl. 1997) and 5-65-206 (Supp. 2003). Rebecca also alleged that Harold knew or should have known that Sandra would operate the vehicle in a negligent manner that would endanger other drivers and pedestrians, and that Sandra's negligence and Harold's negligent entrustment were the proximate cause of her severe injuries.

On July 17, 2003, Harold answered Rebecca's complaint. He admitted that he was the owner of the vehicle in question but denied permitting Sandra to operate his vehicle. Harold further alleged that he had sold the vehicle to his brother, Larry Morgan, on installments and had instructed his brother not to allow anyone else to operate the vehicle. Harold also denied that Rebecca had been injured to the extent she alleged in her complaint, and he also denied that his conduct was the proximate cause of her injuries. An amended complaint added Korey Collins as a plaintiff and Larry Morgan as a defendant, sought damages against Larry Morgan for negligent entrustment, and alleged a cause of action for loss of consortium for Korey Collins.

Harold, Larry, and Sandra gave sworn statements on August 7, 2000, at the offices of Nationwide Insurance Company. The following was established during Harold's statement. In June 1999, Harold purchased a 1995 black, Hyundai S-coup that he financed through a bank. Sometime between September and November,

Harold ceased using the car. Larry needed a car, and Harold decided to sell the Hyundai to Larry in September or October of 1999. The sale was conditioned upon Larry making the monthly insurance premium payment and paying Harold $175 per month for the car payment. The title was to remain in Harold's name until the purchase price was paid in full, and Larry was not to allow anyone else to drive the car because other drivers were not insured. Despite this warning, Harold admitted that Larry had let Sandra drive the car on one occasion; and that, when he saw her driving the car, he chased her and instructed her to never drive the car again. During this encounter, Harold inquired whether Sandra had a driver's license, and Sandra said that she did, but that "Springdale's got them." Harold then confronted Larry about having seen Sandra driving the car. On the day of the confrontation, Larry said that he had been drinking, but denied giving Sandra the keys to the car. Harold told Larry that he had seen Sandra in the car, and Larry then stated that he had been sleeping and did not know anything about the situation. Harold instructed him not to allow Sandra to drive the car or he would take it. When asked whether he thought Sandra would drive the car again after he confronted her about driving it the first time, Harold replied, "Everybody deserves their first chance, you know, I mean, if you do something wrong, you know, I mean, I'm game for it, you know. I'm — everybody — you know, you ain't perfect. So I give him a second chance, but the second chance didn't go no more. That was it. There wasn't no third or nothing." Harold described Sandra as a "drifter," "alcoholic," and "fly-by-night" girl.

Harold stated that he did not learn of the accident until two days after it had occurred because Larry and Sandra had attempted to keep it a secret. At first, Harold thought that Sandra had hit another vehicle but later learned that she had hit a pedestrian. Five days later, when Harold spoke to Larry about the accident, Larry said that Sandra had been taken to jail for DWI, for failing to take a sobriety test, and for driving on a suspended driver's license. When asked whether he knew how Sandra ended up with the car on the date of the accident, Harold explained that Sandra took the car while Larry was sleeping and started it with a bobby pin. When asked whether he had spoken to Sandra since the accident, Harold stated, "I don't want to say the words I said, because — it — it hurt me bad, you know, because she knew she wasn't supposed to drive that car." When asked whether he told Sandra she was not supposed to be driving the car, Harold said, "Yes, sir, I sure did.

. . . She knows it. [She said,] 'Oh, I'll never drive it again. I'll never — I thought it was Larry's.' " Harold said that he responded, "No, it's mine and Larry's, but it's more mine than it is Larry's. Until he pays for it, it's mine. . . . You never ever drive this damn car again." Harold went on to say that, when discussing the accident, Larry had told him that he did not give Sandra permission to drive the car. He further stated, "I haven't really talked to her about it. I don't know. All I know is they said they didn't give her permission to drive it, and she knows she didn't have permission to drive it." Apparently frustrated by the vague stories he was receiving regarding the circumstances of the accident, Harold told Larry, "Well, then, you get you'un's asses from Little Rock down here, and all four of us is going down there, and you're going to tell [them] what the hell went on, because I don't know what's going on, neither, because y'all lie to me every time I turn around. I don't know — you go in there and you tell [them] that you didn't give her permission, and she can tell them that she didn't have permission." Harold also stated that every time he saw Larry he would remind him, "Remember, don't let nobody drive that [car]."

Following Harold's statement, Larry testified that he received the Hyundai in November 1999 after the motor in his van quit. He too stated that he was responsible for paying the $175 car payment and the insurance premium. Larry, however, denied that he owned the car. He said, "More or less I was making the payments. It wasn't really mine. It was just that I was using it until I got my van straightened out." Larry stated that, if he got his van working and decided that he no longer wanted the car, he could give it back to Harold, but that, if he kept it until it was paid off, then the car would become his. He admitted that Harold had instructed him not to allow other people to drive the car; that he allowed Sandra to drive the car on one occasion; and that, after Harold confronted him about seeing Sandra driving the car, he did not allow her to drive the car again. On the one occasion that Larry permitted Sandra to drive the car, Larry stated that he had given her the key to the car. At the time that Larry had given Sandra permission to drive the car, he had only known her for approximately one week. The two began living together; Larry had a car, but Sandra did not. Larry was asked how Sandra got around if she did not own a car. Larry said, "Me most of the time. I done most of the driving."

Larry stated that, on the day of the accident, he had been with Sandra at the hospital the night before. Sandra had been hospitalized for three days due to substance abuse. She was released at 8:00 a.m. that morning, and Larry drove her to his sister's house where the two of them were living. The two talked until about 10:30 a.m. when Larry fell asleep. He testified that he was tired because he had been up all night with Sandra at the hospital the night before. When he awoke approximately one hour later, he discovered that Sandra and the vehicle were gone. He said that the keys to the car were in his pocket so, at first, he did not know how she got the car started. He said, "I figured, you know, she — had to be the only one driving it. I mean I had the key in my pocket." Larry began looking for Sandra. He went to the places he thought she might be and the lake. He discovered that she was in custody at the Springdale police station for DWI. Larry bonded Sandra out of jail, and she explained that she had rear-ended a woman. Apparently, Sandra had been attempting to make a turn into a trailer park, but missed her turn and hit Rebecca. Other than that explanation, Larry said that Sandra could not remember the details of the accident. When asked whether he had given Sandra permission to drive the car on the day of the accident, Larry responded that he had not given her permission; that Sandra knew she did not have permission to drive the car; and that she had started the ignition with a pair of eyeglasses. Larry stated that there was only one set of keys to the car, and they were in his pocket when Sandra took the car; but that the tip of his car key is broken off in the ignition, which may explain how she got the car started with a pair of eyeglasses.

Sandra's testimony mirrored Harold and Larry's testimony regarding her impermissive use of the vehicle. She admitted that she drove the car on one occasion with Larry's permission; that Harold instructed her not to drive the car because her driver's license was suspended and because she was not an insured driver; and that on the day of the accident she did not have permission to drive the car. She admitted that she had two prior DWI offenses. She stated that, on the day she was released from the hospital, however, she was heavily medicated. During her statement, she provided documents from the hospital; however, the documents indicated that Sandra had received only insulin, "Hepatitis C viral," and "Peptide." She also testified that she had been released from the hospital at 2:30 p.m.; that she remembered being released in the afternoon because she had had lunch at the hospital that day; and that it was daylight when she left. When told that the incident

report indicated that the accident occurred at 11:55 a.m., Sandra seemed confused and stated, "Well, see that goes to show you. I don't — I don't have any idea."

Sandra said that, after she was released from the hospital, she went to Larry's house. While Larry was asleep, she took the car without his permission to get a pack of cigarettes. She stated that, because the key had been partially broken off in the ignition, she was able to start the vehicle by bending a pair of eyeglasses and inserting them into the ignition. She stated that she then drove the car to the gas station, but that she was unable to remember anything else other than the police putting her in handcuffs. Later on in her statement, Sandra remembered that she missed the turn into the trailer park and ended up in the Thrifty Rental parking lot; that she recalled seeing the woman on the tailgate of a truck and hearing a woman yelling, "call 9-1-1 . . . She's pregnant"; and that she recalled being taken to jail. She admitted that she was at fault for the accident and for taking the car without permission, but' denied that she had been drinking on the day of the accident. Sandra also denied that she had ever taken any vehicle without the owner's permission and attributed her conduct to the drugs she had allegedly taken at the hospital.

On November 19, 2003, Harold filed a motion for summary judgment. The motion indicated that, according to sworn statements taken from him, Larry Morgan, and Sandra Powell, Sandra operated the vehicle without permission and without Harold's knowledge. After setting out the law applicable to motions for summary judgment, Harold argued that he was entitled to judgment as a matter of law because there are no genuine issues of material fact to be litigated where sufficient evidence did not show that he knew or had reason to know that Sandra would steal the car without Larry's knowledge or permission that he had sold to Larry.

On December 3, 2003, the Collinses filed a response to Harold's motion for summary judgment, alleging that there were genuine issues of material fact to be decided by a jury. The response challenged the credibility of the statements given by the three defendants and asserted that the facts surrounding how Sandra came into possession of the vehicle on the date in question were "suspect and susceptible to at least one reasonable hypothesis consistent with an entrustment of said vehicle that would render Harold Morgan liable." Accordingly, the Collinses sought denial of Harold's motion for summary judgment.

Attached to their response was a copy of Rebecca Collins's answers to Harold's interrogatories. In her answers to the interrogatories, she identified six persons having knowledge of the facts surrounding the accident. She indicated that Soni Fitzpatrick, a potential witness, was an employee of the Thrifty Car Rental on the day of the accident; that she observed Rebecca being struck by the vehicle; that she observed Sandra turn off the car and put the keys to the car in her pocket; that, when Sandra came over to Rebecca, Soni smelled a strong odor of alcohol; that she asked Sandra if she had been drinking; and that Sandra admitted that she had. These statements also appear in a sworn affidavit attested to by Soni, which was also attached to the response. Soni's affidavit also states that Sandra never stated that she did not have permission to drive the car or that it was stolen. The response also indicates that Rebecca observed Sandra with the keys to the car and would testify that Sandra was belligerent and had been drinking. There is also a sworn affidavit from Rebecca indicating that she saw Sandra with the keys to the car in her hand.

The response also included Rebecca's response to a request for production of documents. Attached to the request is a copy of the police report, which indicates that Sandra was cited for failing to submit to a sobriety test and for DWI. The response also indicated that there was also an oral statement from the tow truck driver that, generally, when he tows cars for the Springdale Police Department, he is given the keys to the vehicle.

The trial court granted Harold's motion for summary judgment on the pleadings and the Collinses appeal.

Our standard of review for summary judgment cases is well-established. *Ginsburg v. Ginsburg*, 353 Ark. 816, 820–21, 120 S.W.3d 567, 569–70 (2003). Summary judgment should only be granted when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Id.* The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. *Id.* We no longer refer to summary judgment as a "drastic" remedy and now simply regard it as one of the tools in a trial court's efficiency arsenal. *Id.* Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.*

On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented

by the moving party in support of the motion leave a material fact unanswered. *Id.* We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.* Moreover, "[i]f a moving party fails to offer proof on a controverted issue, summary judgment is not appropriate, regardless of whether the nonmoving party presents the court with any countervailing evidence." *Id.* at 821, 120 S.W.3d 570.

The Collinses raise five points on appeal and present several subarguments. Because their first, fourth, and fifth points on appeal deal with the issue of negligent entrustment, we address those arguments together. In this regard, the Collinses argue that (1) based on the standard of review, the trial court erred in granting the motion for summary judgment on the issue of negligent entrustment; (2) Sandra had implied permission to drive the car; and (3) Harold is liable for his entrustment of the vehicle to Larry. We agree that the Collinses have demonstrated the existence of a genuine issue of material fact regarding the issue of negligent entrustment.

"Negligent entrustment" is established by showing that: (1) the entrustee was incompetent, inexperienced, or reckless; (2) the entrustor knew or had reason to know of the entrustess's conditions or proclivities; (3) there was an entrustment of the chattel; (4) the entrustment created an appreciable risk of harm to the plaintiff and a relational duty on the part of the defendant; and (5) the harm to the plaintiff was proximately or legally caused by the negligence of the defendant. *Mills v. Crone*, 63 Ark. App. 45, 49, 973 S.W.2d 828, 831 (1998).

In *Mills, supra*, we quoted from Section 308 of the Restatement 2d of Torts:

> *It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such a person intends or is likely to use the thing* or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

(Emphasis added.) Permission to use a thing may be expressed on implied. *Norskog v. Pfiel*, 197 Ill.2d 60, 755 N.E.2d (2001) (citing Restatement (2d) of Torts § 308). In *Clark v. Progressive Ins. Co.*, 64

Ark. App. 313, 984 S.W.2d 54 (1998), this court considered whether an insured had given her live-in boyfriend implied permission to drive her car when he hit and killed a pedestrian. The court stated:

> Whether the owner has given another person implied permission to drive his or her automobile depends on the nature of the relationship between the owner and the borrower. The standard treatise on the law of insurance describes 'implied permission to drive an automobile' as follows:
>
> > An implied permission . . . is not confined to affirmative action, but means an inferential permission, in which a presumption is raised from a course of conduct or relationship between the parties in which there is a mutual acquiescence or lack of objection signifying consent.
> >
> > But implied permission is not limited to such situations, and will be evaluated in light of all facts and circumstances surrounding the parties. Implied permission may be proved by circumstantial evidence. Circumstances such as usage, practice, or friendship may be used to show implied permission.
> >
> > *It may be found that the insured has given implied permission where the named insured has knowledge of a violation of instructions and fails to make significant protest. . . .*
>
> • • •
>
> *If the owner of an automobile forbids another person from driving the automobile, but the other person continues to do so with the knowledge of the owner, then the owner has given implied permission to drive the automobile.*

*Id.* at 318–19, 984 S.W.2d at 58 (citations omitted) (emphasis added). In *Clark*, the court concluded that, because the insured's boyfriend stated that she knew he continued to drive her car even though she had told him not to do so, there existed a genuine issue of material fact regarding whether the insured had impliedly permitted her boyfriend to drive her car.

We find that there are genuine issues of material fact with regard to the issue of negligent entrustment. Harold's motion for summary judgment was based, in large part, on his assertion that there was no genuine issue of material fact regarding his entrustment of the car to Sandra. We disagree. As we stated in *Mills, supra,*

a person is negligent if he permits a third party to use a thing and knows or should know that the entrustee intends to use it in a manner that creates a risk of harm to others. Here, the record reveals an issue of fact regarding Harold's implied permission and entrustment of the car to Sandra.

The first issue concerns whether, after Harold discovered a violation of his instructions, he made a significant protest to Sandra's operation of the vehicle. *Clark, supra.* The facts indicate that, when Harold discovered Sandra driving the car the first time, he confronted her and instructed her not to drive the car again. Sandra responded that she believed that the car belonged to Larry, and Harold informed her that it belonged to them both. He also asked whether she had a driver's license, and Sandra said that she did not. When he contacted Larry regarding Sandra's use of the vehicle, Larry initially denied that Sandra drove the car, and later recanted his story when Harold told him that he had seen Sandra in the car. Larry also denied giving Sandra the keys to the car and stated that he did not know anything about Sandra driving the car because he was sleeping, but later stated that he had given her the keys to the car so that she could take some tools to his father's house because he had been drinking and could not drive. Harold stated that he threatened to take the car if Larry permitted Sandra to use the car again, but also stated that he felt everyone deserved a "second chance." When asked whether he thought Sandra would drive the car again after he confronted her about driving it the first time, Harold replied, "Everybody deserves their first chance, you know, I mean, if you do something wrong, you know, I mean, I'm game for it, you know. I'm — everybody — you know, you ain't perfect." Harold also stated that he had told Larry that if he could not adhere to their agreement, then Larry should bring the car back, and that he constantly reminded Larry that he should not permit other people to drive the car. Although Harold took the car after the accident involving Rebecca Collins, he first indicated that he took the car back because Larry had failed to make payments. Later in his statement, he indicated that he took the car because Larry had allowed Sandra to drive the car. Nonetheless, it is clear that Harold did not take the car back until after the accident that is the subject of this case. Given these facts, we conclude that there exists a genuine issue of material fact regarding the sufficiency of Harold's protest after he discovered Sandra driving the car and whether his actions constitute implied permission.

Second, the facts show that there is an issue regarding whether Harold knew that Sandra was operating the car even though he had told her not to. Although there is no statement from Sandra indicating that Harold knew that she continued to operate the car despite his prohibition, as there was in *Clark, supra,* the circumstantial evidence in this case presents a genuine issue of dispute. In *Clark, supra,* we stated that, when another person operates an insured's vehicle even though the insured has forbade him to do so, and the insured knows, then the insured has given implied consent. Implied consent can be shown by circumstantial evidence. *Clark, supra.*

A jury should be allowed to determine whether, under the circumstances, Harold knew that Sandra drove the car despite his instruction. Sandra is Larry's live-in fiancee. She does not have a car of her own and depends on Larry's transportation to get around. After knowing Sandra one week, Larry allowed her to drive the car to his parents' house to deliver tools. At the time of the accident, they had been together for a month. According to Harold's statement, he was not sure whether Larry allowed Sandra to drive the car, and he stated that Larry and Sandra often lied to him. It also appears that Harold was not completely convinced that Larry had adhered to their agreement. He admitted that he had to constantly remind Larry not to allow other people to drive the car, expressed frustration over the inconsistent stories he got from Larry, and admitted that Larry and Sandra often lied to him. In fact, Harold stated that Larry and Sandra attempted to keep the accident a secret, and that he learned of the accident two days after it happened. When he finally discussed the accident with Larry, Larry told Harold that Sandra had taken the keys while he was asleep; that he had not given her the keys; and that he did not give her permission to drive the car. This is the same story that Larry gave Harold when Harold discovered Sandra driving the car the first time. That time, Larry stated that he did not know that Sandra had driven the car, and that he had not given her the keys. Only after Harold informed Larry that he had seen Sandra driving the car did Larry admit that he had given her the keys to drive the car because he was drunk or asleep and could not drive.

Given these facts, we find that a jury should have been allowed to determine whether Harold gave Sandra implied permission to drive the car, whether Harold knew or should have known that Sandra would operate the car even though he had

instructed her not to, and whether Harold's actions were sufficient to constitute a significant protest after he discovered the violation of his instructions.

Additionally, the fact that there are two entrustments is not a bar to recovery. *LeClaire v. Commercial Siding and Maint. Co.*, 308 Ark. 580, 826 S.W.2d 247 (1992). An original entrustor may be liable for negligence in entrusting chattel to one who further entrusts it, resulting in injury to another person. *Id.* (discussing *Garrison v. Williams*, 246 Ark. 1172, 442 S.W.2d 231 (1969) (upholding a jury's verdict that found Garrison liable for injuries suffered by Williams's daughter in a car accident where Garrison had entrusted his vehicle to his fifteen-year-old son, who then entrusted it to his fifteen-year-old friend, who caused the accident the resulted in Williams's daughter's injuries)).

First, it is clear that Harold entrusted the vehicle to Larry. Harold allowed Larry to drive the car conditioned upon payment of the car insurance, payment of the car note, and their agreement that Larry would not take the car out of state or permit others to drive it. There is testimony that, despite his agreement with Harold, Larry permitted Sandra to drive the car to his father's house to deliver some tools because he was too drunk to drive. Harold warned Larry about letting Sandra drive the car, and Larry maintains that he adhered to the warning. He denied allowing Sandra to drive the car on the day of the accident and testified that he had the keys with him at all time. However, the Collinses presented a sworn affidavit from Soni Fitzpatrick that states that she saw Sandra with the keys to the car after the accident. Rebecca Collins also indicated in her response to Harold's interrogatories and in her affidavit that she saw Sandra with the keys after the accident. Thus, the question remains whether Larry did in fact entrust the vehicle to Sandra by giving her the keys to the car on the day of the accident or by otherwise permitting her to use the car. If Larry negligently entrusted the vehicle to Sandra, then Harold may be liable as the original trustor. *LeClaire, supra; Garrison, supra.* The fact that there were two entrustments does not bar appellants' recovery. *LeClaire, supra.*

There is also a question regarding whether Sandra was drunk at the time of the accident, and therefore, whether Larry entrusted the vehicle to a person he should have known would drive in a reckless manner. Both Larry and Sandra deny that she had been drinking that day; however, the Collinses provided an affidavit, a police report, and court documents indicating that Sandra was

arrested for DWI on the day of the accident and was subsequently prosecuted. Larry also indicated that Sandra was medicated. So, even if Sandra was not drunk, if Larry gave her the keys to the car, then he entrusted the vehicle to an incompetent person. Larry should have known of Sandra's proclivities for drinking excessively because she did not have a driver's license as the result of previous DWIs and had just been released from the hospital for substance abuse or alcoholism. Harold also indicated that he was aware that Sandra's driver's license had been suspended and that she was an alcoholic.

■ Accordingly, we find that the Collinses have presented proof of a number of genuine issues of material fact regarding the issue of negligent entrustment, namely: (1) whether Harold gave Sandra implied permission to drive the car, thereby entrusting it to her; (2) whether Harold's conduct constituted a significant protest after he discovered the violation of his instruction to not allow Sandra to operate the car; (3) whether Larry entrusted the vehicle to Sandra by giving her the keys; (4) and whether Harold or Larry entrusted the car to her knowing of her proclivities.

For their second and third points on appeal, the Collinses argue that summary judgment was not appropriate in this case because it was based on the sworn statements of the three defendants — who were all interested parties in this case. The Collinses note that the sworn statements were taken at the insistence of Harold's insurance company; that they were not subject to cross-examination; and that each of the witnesses were parties to the lawsuit. The Collinses also challenge the credibility of all three witnesses and maintain the summary judgment was not appropriate because of the inconsistencies in the witnesses' statements. This argument has merit.

The Collinses cite this court to a line of cases that hold that the trial court is not required to accept the testimony of an interested witness and that the testimony of such witnesses cannot be considered undisputed merely because there was no contradictory evidence presented. *See Motors Ins. Co. v. Tinkle*, 253 Ark. 620, 488 S.W.2d 23 (1972); *Old Republic Ins. Co. v. Alexander*, 245 Ark. 1029, 436 S.W.2d 829 (1969); *Knighton v. Int'l Paper Co.*, 246 Ark. 523, 438 S.W.2d 721 (1969).

In *Motors, supra,* our supreme court stated, "We have said many times that in weighing testimony, courts must consider the interest of a witness in the matter in controversy, and that a trier of

facts is not required to accept any statement as true because merely so testified." *Id.* at 626, 488 S.W.2d at 28. The supreme court noted that the underwriter, an interested party, presented no proof of its underwriting standards or testimony from a disinterested witness. *Id.* Thus, the underwriter's testimony could not be taken as undisputed, and the trial court was not required to accept it even though no contradictory evidence was offered. *Id.*; *see also Old Republic Ins. Co, supra.*

Appellants also cite *Clark, supra,* wherein the court stated:

> A review of the record reveals several circumstances that would cause a reasonable fact-finder to doubt the truthfulness of Moseby's deposition testimony. Although there is little Arkansas authority directly on point addressing whether a motion for summary judgment should be denied because of the lack of credibility of the moving party's supporting evidence, there is ample persuasive authority in federal court decisions interpreting the federal version of our summary-judgment rule, Ark. R. Civ. P. 56, which is Federal Rule of Civil Procedure 56. We consider federal court decision interpreting Fed. R. Civ. P. 56 to be highly persuasive authority.

*Id.* at 320, 984 S.W.3d at 59. The *Clark* court went on to state that federal court decisions interpreting the Federal Rules of Civil Procedure establish that a trial court may deny a motion for summary judgment based on the lack of credibility of the moving party's affiants or witnesses. *Id.* The court further stated, "Doubts as to the credibility of the movant's affiants or witnesses may lead the court to conclude that a genuine issue [of material fact] exits." *Id.* at 321, 984 S.W.2d at 59. Moreover, the court stated, "Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied." *Id.* at 321, 984 S.W.2d at 59.

In *Clark*, Reginald Moseby hit and killed Otha Jordan while fleeing from the Dermott police. *Id.* At the time of the accident, Moseby was driving his girlfriend, Teresa Moore's, car. Moore was insured by Progressive Insurance Company, who sought declaratory judgment on the issue of whether it was obligated to defend Moseby in a suit brought by the victim's heirs. Progressive then moved for summary judgment arguing that it was not obligated to defend against the action because Moore's policy did not cover non-permissive drivers. The motion was denied, and Progressive

deposed Moseby. Progressive then filed a second motion for summary judgment, attaching Moseby's deposition. The trial court granted the second motion for summary judgment.

In his deposition, Moseby testified that he and Moore had been "together" for twelve years; that the two lived together and had three children; that he never owned a vehicle, but that he helped Moore make the car payments on her car; that, even though Moore had forbidden him to drive the car, he had done so anyway, and that Moore knew that he had done so; and that, on the night he struck and killed Otha Jordan, Moore would not give him permission to drive the car, the two struggled, and he took the keys and left without her permission. When asked whether he considered the car his, Moseby responded, "I been with her twelve years, so she's my wife, so what's hers is mine and what's mine is hers."

On appeal, this court reversed the trial court's grant of summary judgment in favor of Progressive. The *Clark* court found that several statements made during the Moseby's deposition revealed his potential bias. *Clark, supra.* The court also found that his bias established a motive for him to tailor his account of what happened on the night of the accident. *Id.* The court concluded that a reasonable fact-finder could doubt the truthfulness of Moseby's deposition because (1) his bias in favor of Moore would lead him to help her avoid adverse financial consequences, for example to protect her from increased insurance premiums should Progressive have to pay a claim, (2) his bias might lead him to tailor his testimony at Moore's request, especially because he admitted that he had spoken to her about the case (3) his bias might lead him to testify falsely in order to protect Moore from liability in a wrongful death suit brought by Jordan's heirs, and (4) the witness was a convicted felon who was, at the time of his deposition, imprisoned for Otha Jordan's death and may not be deterred by the possibility of a perjury conviction. The court also noted that Progressive only spoke with Moseby after its first motion for summary judgment was denied.

We find *Clark, supra*, persuasive and hold that the adverse parties' testimony in this case reveals potential bias and creates a genuine issue of material fact. First, as the Collinses note, all three of the parties are related. Harold and Larry are brothers, and Larry and Sandra are live-in boyfriend and girlfriend. Therefore, the three have a motive to tailor their testimony or to testify falsely to shield Harold from liability for the Collinses' injuries or from

increased insurance premiums should the insurance company be required to pay the Collinses' claims. Also, Harold's testimony that he prohibited Sandra from using the car was self-serving because, as he admitted, only he and Larry were insured drivers. The facts also show that Harold, Larry, and Sandra had spoken about the case prior to giving their statements which were taken at Harold's insurance company.

All three parties gave inconsistent testimony during their statements, and we have detailed a great number of them in this opinion. For example, Harold stated that he took the car from Larry because he failed to make payments; however, he later stated that he and his wife took the car from Larry because of the accident. Sandra testified that she had not been drinking on the day of the accident, but was heavily medicated. The exhibits attached to appellants' response to the motion for summary judgment show that witnesses stated that they smelled alcohol on Sandra's breath, and that she acted belligerent and "drunk." She was arrested DWI on the day of the accident, and the police report indicates that she was obviously drunk, and her hospital documents did not show that she was medicated upon release. Furthermore, Sandra's credibility is questionable. She testified that she was not released from the hospital until 2:30 p.m., and that she had lunch at the hospital. Larry testified that he picked Sandra up from the hospital at 8:00 a.m., and the accident report shows that the accident occurred at 11:55 a.m. Sandra's testimony was inconsistent and subject to impeachment. The trial court erred in granting Harold's motion for summary judgment because a reasonable trier of fact could conclude that all three witnesses for appellee were biased, and because a reasonable fact finder could have found that the testimony was further inconsistent and not credible, and therefore, could disregard it. *Clark, supra.*

Accordingly, because we find that there exist several genuine issues of material fact, we reverse and remand for trial.

Reversed and remanded.

HART, ROBBINS, and NEAL, JJ., agree.

GLADWIN and GLOVER, JJ., dissent.

ROBERT J. GLADWIN, Judge, dissenting. I dissent because there is no question of material fact to be decided by the jury in this case. We no longer refer to summary judgment as a drastic

remedy and now regard it as one of the tools in a trial court's efficiency arsenal. *Little Rock Elec. Contractors, Inc. v. Entergy Corp.*, 79 Ark. App. 337, 87 S.W.3d 842 (2002). We will only approve the granting of summary judgment when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to its day in court because there are not any genuine issues of material facts remaining. *Id.; see also Riverdale Dev. Co., LLC v. Ruffin Bldg. Systems, Inc.*, 356 Ark. 90, 146 S.W.3d 852 (2004). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Riverdale, supra.* On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.*

The general rule for negligent-entrustment liability states that it is negligence to permit a third person to use a thing or to engage in an activity that is under the control of the actor, if the actor knows or should know that such a person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others. *Mills v. Crone*, 63 Ark. App. 45, 973 S.W.2d 828 (1998). The words "under the control of the actor" are used to indicate that the third person is entitled to possess or use the thing or engage in activity only by the consent of the actor and that the actor has reason to believe that by withholding consent he can prevent the third person from using the thing or engaging in the activity. *Id.*

The elements of a claim of negligent entrustment are stated in *Balentine v. Sparkman*, 327 Ark. 180, 937 S.W.2d 647 (1997). There must be proof that: (1) the entrustee was incompetent, inexperienced, or reckless; (2) the entrustor knew or had reason to know of the entrustee's condition or proclivities; (3) there was an entrustment of the chattel; (4) the entrustment created an appreciable risk of harm to the plaintiff and a relational duty on the part of the defendant; (5) the harm to the plaintiff was proximately or legally caused by the negligence of the defendant.

Harold Morgan gave his statement concerning the accident. According to Harold, he was selling the Hyundai to his brother

Larry Morgan but retained the title to the vehicle until such time as the car was paid for in full. Larry was to make the payments on the car, pay the insurance, and not let anyone else drive the car. Harold and Larry were the only named insureds on the vehicle.

Harold described Sandra Powell, Larry's fiance, as "just a drifter, you know. I mean I know her from a lot of people but as far as knowing her I don't . . . I don't know her background or history or anything . . . I don't really talk to her because we don't get along."

On one occasion prior to the accident, in June 2000, Harold learned that Sandra Powell had driven the vehicle. Harold testified that he followed Sandra to where she had driven the car and told her, "Don't never let me see you in this car again driving it, because if I do I'm pulling your ass right out of it." He further testified,

> "[Y]ou know, until the day that I noticed — that I stopped her, you know, and told her to get out of the car, that she wasn't suppose to drive it. She told me she had a driver's license. I said, 'Well, where are they at?' [Sandra responded] 'Springdale's got them.' I said 'You ain't got shit.' I said 'Don't never let me catch you in this car again' . . . . 'Ever.' "

He also testified that he continued to tell Larry that only he could drive the car.

Harold further testified that he did not know of the accident with appellant Rebecca Collins until two days after it occurred, "because they kept saying, 'Don't tell him because it wasn't nothing,' you know, and all this, and I told my brother, 'that's bullshit, I know better than that. Anytime you have an accident they're going to have a police report.' "

Larry Morgan testified that he was purchasing the car from his brother. He was to make the payments while he was driving it, and he explained that "[i]f I kept it until we got it paid off, it would be mine." He further testified that Harold told him that no one else should drive it but him. Larry testified that on one occasion he let Sandra Powell drive the car because he had been drinking and that it was the only time he gave her permission to drive it. He explained that she did not ask to drive the car again and that she did not drive it again prior to the accident.

Larry explained that on the day of the accident Sandra left the hospital after a three-day stay. Larry stated that he had been up with her all night trying to take care of her, and upon her release,

they had gone home for him to take a nap before going to work. He stated that when he woke up after about an hour the car was gone but the only key was in his pocket. He testified that he did not know how Sandra got it started but that the tow-truck driver told him, "She had the sunglasses stuck in the ignition, and it started with them." Larry stated that he had specifically told Sandra not to drive the car, that she knew she was not to drive it, and that she had not been driving it except on the one occasion in June 2000.

Sandra Powell testified that she was told by both Harold and Larry never to drive the car because she was not on the insurance and did not have a current driver's license. She stated that Larry had only given her permission to drive the car on the one previous occasion and that no one gave her permission to drive it the day of the accident. She also explained that she started the car with a pair of eyeglasses by folding them and sticking them into the ignition where a piece of previously broken key remained. In response to this testimony, appellants filed nearly identical affidavits from Rebecca Collins and Soni Fitzpatrick in which they stated that following the accident they saw Sandra Powell exit the vehicle with keys in her hand.

The majority points to no evidence that Harold gave Sandra express permission to use the vehicle, so our analysis must be based upon implied entrustment. It may be found that the insured has given implied permission where the named insured has knowledge of a violation of instructions and fails to make a significant protest. *Clark v. Progressive Ins. Co.*, 64 Ark. App. 313, 984 S.W.2d 54 (1998). If the owner of an automobile forbids another person from driving the automobile, but the other person continues to do so with the knowledge of the owner, then the owner has given implied permission to drive the automobile. *Id.*

The majority first questions whether Harold made a significant protest after he discovered the violation of his instructions. Harold testified that he told Sandra that if he caught her in the car again he would be "pulling her ass right out of it." He further referred to Sandra's assertion that she had a driver's license as "bullshit" and told her not to drive the car. I can think of no more significant protest short of a battery or false imprisonment that would make Harold's point more clear. The majority also makes much of Larry and Sandra lying to Harold about having the car after the accident. The only reasonable inference that can be drawn from this is that they knew that Sandra did not have permission to

drive it, either express or implied, and that they might well be facing Harold's wrath. There is simply no permission shown from the facts presented. Another factor to be considered is the relationship between the parties. The fact that Harold and Sandra did not get along is uncontradicted. Therefore, that circumstantial evidence of implied consent is missing in this case.

The majority next states that there are facts that create an issue as to whether Harold knew that Sandra was operating the vehicle against his instructions, thus creating an implied permission. The majority readily admits that "there is no statement from Sandra indicating that Harold knew that she continued to operate the car despite his prohibition." There is, in fact, no evidence presented that Sandra actually drove the car other than the first time, when Harold protested, and on the day of the accident. The majority states that the following facts constitute circumstantial evidence that Sandra continued to drive the car after Harold protested: (1) Sandra was Larry's fiance; (2) they had been together for some months; (3) she did not have her own car; (4) Larry allowed Sandra to drive the car on one previous occasion. It is sheer speculation to find that those facts prove that Harold knew that Sandra drove the vehicle at other times. Not one shred of evidence presented by the appellants demonstrates that Sandra drove the car other than the two times testified to by Harold, Larry, and Sandra.

I agree that the fact that there may have been two entrustments is not a bar to recovery. *See LeClaire v. Commercial Siding & Maint. Co.*, 308 Ark. 580, 826 S.W.2d 247 (1992). However, there is no evidence that Harold's entrustment to Larry was in any way negligent. None of the elements set forth in *Balentine, supra,* are met other than an initial entrustment from Harold to Larry. Accordingly, the only scenario in which Harold might be liable under a serial-entrustment theory is if he failed to significantly protest to Larry's first entrustment to Sandra. As stated earlier, Harold's protest on that occasion was most certainly significant.

The majority goes on to state that there is a material question of fact as to whether Sandra was drunk at the time of the accident. This is not a material question of fact regarding the trial court's granting of Harold's motion for summary judgment. Viewing the facts in the light most favorable to appellants, Sandra appears to be responsible for appellant Rebecca Collins's injury, whether or not she was drunk at the time. However, Sandra's intoxication is not material as to whether Harold negligently entrusted the car to

Larry or gave permission to Sandra to drive the car. Again, it is uncontradicted that Harold was unaware of the accident for two days afterward.

Federal court decisions interpreting the Federal Rules of Civil Procedure establish that "a trial court *may* deny a motion for summary judgment based on a lack of credibility of the moving party affiants or witnesses." *Clark*, 64 Ark. App. at 320-21, 984 S.W.2d at 59 (emphasis added); *see also* 10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726 at 440-47 (1998). The majority holds that, if there is potential bias, then a material question of fact exists. Under this standard, adverse parties in all cases would have potential bias, so summary judgment would never be appropriate. The object of summary-judgment proceedings is not to try the issues but to determine whether there are any issues to be tried. *City of Lowell v. City of Rogers*, 345 Ark. 33, 43 S.W.3d 742 (2001). When a summary judgment motion is put forth with affidavits attached, the motion's opponent cannot rely on a base denial or contrary allegations but must meet proof with proof. *Rankin v. City of Fort Smith*, 337 Ark. 599, 990 S.W.2d 535 (1999). Here, appellants offered no proof as to Harold's knowledge or actions that would support their claim of negligent entrustment. Simply stated, appellants did not meet proof with proof, thus summary judgment is appropriate.

Finally, the majority states that Harold, Larry, and Sandra gave inconsistent statements as to the material facts for the cause of action of negligent entrustment; however, their statements are wholly consistent as to the material facts of this case. Each testified that Harold entrusted the car to Larry and that Harold was adamant that Sandra not drive the car after the one time he found her in it. They each also testified that neither Harold nor Larry gave Sandra permission to drive the car subsequent to that one occasion, including the date of the accident, and that Sandra took the car without permission.

For the reasons stated, I would affirm the trial court. I am authorized to state that Judge Glover joins this dissent.