# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3427

_____

Rick Merechka

*Plaintiff - Appellant*

v.

Vigilant Insurance Company, a foreign corporation

*Defendant - Appellee*

_____

No. 19-3497

_____

Rick Merechka

*Plaintiff - Appellee*

v.

Vigilant Insurance Company, a foreign corporation

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Western District of Arkansas - Ft. Smith

_____

Submitted: January 14, 2021
Filed: February 16, 2022

_____

Before GRUENDER, BENTON, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

After Rick Merechka's home burned to the ground, he sought benefits under his homeowner's policy. Following an investigation, his insurer, Vigilant Insurance Company, denied the claim because it concluded that he had lied about the amount of personal property he owned. Merechka wants his claim paid in full, and Vigilant seeks reimbursement for the money it had already paid to his mortgage lender. On cross-motions for summary judgment, the district court concluded that neither side owed the other anything. We affirm in part, reverse in part, and remand for further proceedings.

I.

In some ways, this case is a typical insurance dispute. After a fire destroyed his home, Merechka filed a claim for over $1 million with Vigilant—$634,000 for the dwelling itself and $475,500 for its contents. Vigilant denied the claim.

What makes this case unusual is the reason why. During its investigation, Vigilant discovered that Merechka had filed for bankruptcy just four-and-a-half years earlier. *See In re Rick J. Merechka & Peggy A. Orr*, No. 2:10-bk-76454 (Bankr. W.D. Ark. Mar. 28, 2011). According to his bankruptcy petition, he had around $9,000 in personal property—well short of the more than $600,000 (or $325,825, according to a third-party appraiser) that he reported to Vigilant. Without an explanation for the discrepancy, Vigilant suspected insurance fraud.

Merechka had an answer. He assured Vigilant that he had acquired nearly all of his personal property after the bankruptcy using several sources of income: $700

a week he received for working for his brother, a $1,300 monthly social-security payment, and periodic payments from an investment account.

The numbers did not add up, so Vigilant denied coverage under the policy's concealment-or-fraud provision. In its view, Merechka had "intentionally . . . misrepresented [a] material fact relating to [his] policy:" the "acquisition and possession of the claimed personal property" since his bankruptcy. At no point, however, did Vigilant accuse him of starting the fire or committing any other type of misconduct.

Following the denial, Merechka sued in Arkansas state court. Vigilant filed a counterclaim of its own after it removed the case to federal court. Merechka sought the more than $1 million he thought he was owed under the policy, and Vigilant demanded reimbursement for the nearly $400,000 it had paid to Merechka's mortgage lender.

The case ended at summary judgment. Applying Arkansas law, the district court determined that neither side owed anything. Unhappy with the result, both sides have appealed.

## II.

We review the district court's decision to grant summary judgment de novo. *Braun v. Burke*, 983 F.3d 999, 1002 (8th Cir. 2020). "Summary judgment [was] appropriate [if] the evidence, viewed in [the] light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party [was] entitled to judgment as a matter of law." *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) (quotation marks omitted).

-3-

## A.

Merechka takes aim at the district court's conclusion that there was no genuine issue of material fact on his claim for benefits. Given that Merechka continues to stick by the much lower figure in his bankruptcy petition, the district court reasoned that no reasonable juror could possibly conclude that Merechka did anything other than lie on his proof-of-loss forms, which reported at least $325,825.67 in personal property just a few years later.

In reaching its conclusion, the district court applied Arkansas's two-step framework for resolving coverage disputes. At step one, Merechka had to "establish[] a prima[-]facie case for recovery," *Farm Bureau Mut. Ins. Co. of Ark. v. Foote*, 14 S.W.3d 512, 517 (Ark. 2000), meaning that the "damage [was] apparently within a policy of insurance," *S. Farm Bureau Cas. Ins. Co. v. Reed*, 332 S.W.2d 615, 618 (Ark. 1960) (quotation marks omitted). The court concluded, and no one disputes, that Merechka's homeowner's policy generally covers fire damage, which is all that is required at step one. *See id.*

Step two, which is the focus of the parties' dispute, places the burden on the insurer to prove "that the damages claimed were not covered under the policy." *Foote*, 14 S.W.3d at 517; *accord Reynolds v. Shelter Mut. Ins. Co.*, 852 S.W.2d 799, 803 (Ark. 1993) ("[I]f an insurer claims damages are excluded under its policy, it has the burden of so proving . . . ."). The concealment-or-fraud provision, which "void[ed]" the policy if Merechka "intentionally concealed or misrepresented any material fact relating to this policy before or after the loss," takes center stage at this step. *See Foote*, 14 S.W.3d at 517–18 (treating a dispute over a fraudulent representation this way). The district court concluded that the evidence pointed in only one direction: Merechka intentionally lied about the amount of personal property he owned, a "material fact" that "void[ed]" the policy.

1.

Leaving no stone unturned, Merechka disagrees with every step of the district court's analysis. He says that he did not misrepresent the amount of personal property he owned, and that, even if he did, the lies were neither intentional nor material. In the alternative, even if he did intentionally lie, it makes no difference because the concealment-or-fraud provision is limited to statements made during the application process. Unfortunately for him, none of these arguments are convincing.

a.

Among the least persuasive is Merechka's claim that he never lied. Recall that the total value of his personal property at bankruptcy was, by his own account, around $9,000. Fast forward four-and-a-half years, and his personal property was worth at least $325,000, even by the most conservative estimate.

The difference is striking, which is bad news for Merechka unless he can explain it. *See Gilkerson v. Neb. Colocation Ctrs., LLC*, 859 F.3d 1115, 1118 (8th Cir. 2017) (explaining that "[t]he moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact" (internal quotation marks and brackets omitted)). He claims to have made plenty of money after the bankruptcy, which he then used to amass his allegedly vast collection of personal property. For support, he points to $4,300 in monthly income, split between earnings from working for his brother and social-security benefits. He also claims that he received periodic payments from an investment account that his brother controlled.

But to accumulate more than $325,000 in personal property over a four-and-a-half-year period, Merechka's spending would have needed to exceed an average of $6,000 per month. The problem for him is obvious: he made only $4,300 per month and had a $1,750-a-month mortgage payment and other bills. Even if he spent every remaining penny assembling a collection of personal property, it would not have been enough.

What about those periodic investment-account payments?  Despite having years to substantiate them, nothing in the record, not even a canceled check or a statement, shows that the account even exists, much less that he has received payments from it.  Even his brother, who supposedly controlled the account, was unaware that it existed and tried to invoke his right against self-incrimination to avoid answering further questions about it.  In short, this evidence comes nowhere close to allowing "a reasonable jury [to] return a verdict" in his favor.[1]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

There is more.  Despite the sheer number of purchases he would have needed to make in the four-and-a-half years before the fire, Merechka has no proof—not even a single receipt or canceled check—for *any* of them.  *See Neidenbach v. Amica Mut. Ins. Co.*, 842 F.3d 560, 564–65 (8th Cir. 2016) (relying on the fact that the policyholder had not provided evidence to explain the disparity in value between the bankruptcy estate and what was reported in a proof-of-loss form).  He suggests that the property's replacement value is greater than the amount he paid for it, but "the vast difference" between the bankruptcy estate and his later claims "is still too great to be reconciled."  *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 423 (8th Cir. 2007).

To be sure, as Merechka points out, photographs show the home with various items of personal property inside.  And witnesses identified some of it, including televisions and furniture.  But it is not clear how much he purchased after the

---

[1]Merechka points to two other sources of income, but neither gets him very far.  The first, his ex-wife's alleged income, was never brought to the district court's attention.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (explaining that "a district court is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim" (internal quotation marks omitted)).  The second, his claimed casino winnings, was mentioned for the first time in his reply brief.  *See Berg v. Norand Corp.*, 169 F.3d 1140, 1146 (8th Cir. 1999) ("refus[ing] to entertain [a] new argument" that was "first" mentioned "in [the] reply brief").

bankruptcy, let alone how it adds up to at least $325,000 in value. At best, it just invites the jury to speculate. *See Neidenbach*, 842 F.3d at 564; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

Indeed, we have faced a similar scenario before, not once, but twice. In *Neidenbach*, 842 F.3d at 562, the difference between the bankruptcy estate and the amount claimed a year later was $255,500. And in *Scott*, the difference approached $100,000 over a similar timeframe. 486 F.3d at 420. Both times, we held that there was no genuine issue of material fact for the jury to decide. *Id.* at 422–23; *Neidenbach*, 842 F.3d at 567.

The same is true here. Although Merechka had more time to acquire property than the plaintiffs in *Neidenbach* and *Scott*, no reasonable juror could believe that Merechka acquired so much property in such a short time on his modest income. The only "reasonable inference[]," in other words, is that Merechka lied. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

b.

We reach the same conclusion about whether Merechka's lies were intentional. For the concealment-or-fraud provision to apply, the "covered person" must have "intentionally concealed or misrepresented" a fact. As is often the case, intent may be "inferred from the circumstances." *Willis v. State Farm Fire & Cas. Co.*, 219 F.3d 715, 719 (8th Cir. 2000) (quoting *Gregory v. State*, 15 S.W.3d 690, 693 (Ark. 2000)).

The circumstances here show that Merechka intentionally overstated the value of his personal property to get a bigger payout from Vigilant. With no plausible explanation for how he earned enough to cover the difference, the change between the value of his property at the time of the fire and the amount he reported just a few

years earlier is, quite simply, "inconsistent with honest intent." *Stine v. Sanders*, 987 S.W.2d 289, 293 n.3 (Ark. Ct. App. 1999). So just like in *Neidenbach*, "the only reasonable inference from the record before us is that" he must have intentionally misrepresented its value. *Neidenbach*, 842 F.3d at 565; *see also Stine*, 987 S.W.2d at 293 n.3 ("Circumstantial evidence can provide a basis for the jury to infer fraud . . . .").

We are also not persuaded that Merechka's claimed memory issues—from a head injury suffered years earlier—change anything. First, his own responses at an examination under oath show a remarkable clarity of memory, at least when it comes to facts that helped his case. So, if anything, his alleged memory "loss" caused him to *remember* property he did *not* own, rather than forget what he did own. Second, even assuming the memory issues exist, they would not have prevented him from documenting his purchases with receipts, account statements, or other evidence— something he did not do for anything he supposedly bought. Under these circumstances, we conclude that his self-professed memory issues do not defeat summary judgment. *See Anderson,* 477 U.S. at 252.

c.

Nor is there a genuine issue of material fact about the materiality of Merechka's misrepresentations. Under the concealment-or-fraud provision, the lies must not only be intentional, they must also be about "a material fact." We agree with the district court that there is "little doubt" that Merechka's misrepresentations "touch[ed] on information material to Vigilant's decision." *See Motors Ins. Corp. v. Tinkle*, 488 S.W.2d 23, 27 (Ark. 1972) (discussing materiality).

"[A] fact or circumstance is material" under Arkansas law if it was "reasonably relevant to the insurer's investigation at the time." *Willis*, 219 F.3d at 718 (quotation marks omitted). In *Willis*, for example, the fact that a husband saw his wife "moving personal items out of the house shortly before the fire started" was

-8-

the type of information that was "relevant to the insurance company's investigation." *Id.* at 717–18.

The same is true here. *See Old Republic Ins. Co. v. Alexander*, 436 S.W.2d 829, 833 (Ark. 1969) (observing that materiality "is a question of law . . . when [it is] so obvious that a contrary inference is not permissible"). An accurate inventory of the property destroyed was not just relevant, it was "necessary" for Vigilant "to make a coverage determination." *Neidenbach*, 842 F.3d at 565.

d.

Merechka's final argument about the concealment-or-fraud provision is different. Now he suggests it is ambiguous, meaning that it must be construed "liberally in [his] favor . . . and strictly against the insurer." *Norris v. State Farm Fire & Cas. Co.*, 16 S.W.3d 242, 246 (Ark. 2000).

Merechka's argument hinges on the use of the present-perfect verb tense in the phrase, "*has* intentionally *concealed* or *misrepresented* any material fact relating to this policy before or after a loss." (Emphases added). From the use of the present-perfect tense, he infers that the only misrepresentations that matter are those made during the application process. *The American Heritage Dictionary of the English Language* 1394 (5th ed. 2016) (defining "present perfect" as "expressing action completed at the present time").

There are at least two problems with this argument. First, according to the plain language, the relevant timing for the false statement is "before or after a loss"— *not* when the policy was written. Had Vigilant wanted to limit the concealment-or-fraud provision in the way Merechka suggests, presumably it would have said so by referencing the application or the pre-policy period somewhere. *See RAD-Razorback Ltd. v. B.G. Coney Co.*, 713 S.W.2d 462, 465 (Ark. 1986) (recognizing *expressio unius est exclusio alterius* as a rule of contract interpretation); *Gibson v.*

*Pickett*, 512 S.W.2d 532, 535 (Ark. 1974) ("The intention of the parties must be gathered from the four corners of the instrument itself.").

Second, under Merechka's reading, the words "after the loss" become meaningless. *See Wintermute v. Kan. Bankers Sur. Co.*, 630 F.3d 1063, 1068 (8th Cir. 2011) ("A basic tenet of [Arkansas] contract law is that each word in the agreement should be interpreted to have a meaning, rather than to be redundant and superfluous." (quotation marks and brackets omitted)); *St. Paul Fire & Marine Ins. Co. v. Kell*, 328 S.W.2d 510, 512 (Ark. 1959) ("The law does not permit the [c]ourts to . . . subtract from . . . the language employed in the policy."). If the concealment-or-fraud provision covers only misrepresentations during the application process, which always occur "before . . . the loss," then what could ever come "after"? The fact that Merechka has no answer to this basic question is reason enough to reject his argument. There is, in short, no ambiguity. *See Scottsdale Ins. Co. v. Morrow Land Valley Co.*, 411 S.W.3d 184, 191 (Ark. 2012) ("Language is ambiguous when there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation.").

2.

Merechka's next set of arguments stretches beyond the policy itself to two Arkansas statutes, one of which sets a 20-day limit for insurers to send proof-of-loss forms to their policyholders, Ark. Code Ann. § 23-79-126, and the other requires a full-policy-limit payout for the dwelling when there is a total loss, *id.* § 23-88-101(a)(1). Neither, however, excuses Merechka's intentional and material misrepresentations about the extent of his loss.

a.

We begin with the proof-of-loss statute. The parties agree that Vigilant had a statutory obligation to "furnish . . . forms of proof of loss . . . within twenty (20) days

after [the] loss [was] reported." *Id.* § 23-79-126(a). They also agree that Vigilant did not meet this deadline. Their disagreement is about what happens next.

Fortunately, the statute itself provides the answer. When an insurer fails to provide proof-of-loss forms within 20 days, it "constitute[s] a waiver of [the] proof of loss requirements, and the insurer may not thereafter require" them. *Id.* § 23-79-126(b).

Although the Arkansas Supreme Court has never interpreted this language, we assume it means what it says: an insurer who does not deliver the proof-of-loss forms in time cannot insist that the policyholder submit them. *See Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014) (requiring us to take our best guess at predicting in a diversity case how the state's highest court would rule on an issue like this one). But the statute does not say, despite what Merechka now argues, that the policyholder can then lie on any forms he submits voluntarily. Under the concealment-or-fraud provision, Merechka still had an obligation to respond truthfully.

Our conclusion is consistent with how the claims process works. The purpose of requiring proof of loss, as we have explained, is to "advise[] the insurer of the 'nature and extent of the loss,'" which enables "the company to focus its investigation[] and protect itself against fraud." *Clark v. Mass. Mut. Life Ins. Co.*, 749 F.2d 504, 506 (8th Cir. 1984) (quoting *Haskins v. Occidental Life Ins. Co.*, 349 F. Supp. 1192, 1196 (E.D. Ark. 1972) (applying Arkansas law)); *see also* 13 Steven Plitt et al., Couch on Insurance § 186:22 (2021) (observing that "the purpose of a proof of loss is," among other things, "*to prevent fraud*" (emphasis added)).

Even if the proof-of-loss statute means an insurer sometimes loses the policyholder's assistance, it can still investigate the claim on its own; determine

coverage; and deny the claim on some other basis, including fraud.[2]  A waiver of one defense does not waive them all, *cf. Com. Union Fire Ins. Co. v. King*, 156 S.W. 445, 447 (Ark. 1913) (holding that even though insurer waived the proof-of-loss requirement, it still prevailed on its defense that it had canceled the policy); 13A Couch on Insurance § 196:1 n.3 (explaining that the "obligation to permit examination of the insured's . . . records is independent of the obligations to furnish a proof of loss"), and nothing in the proof-of-loss statute immunizes Merechka from the consequences of his own lies.

b.

Arkansas's valued-policy law does not help Merechka either.  Like most states, Arkansas has a statute that allows policyholders to make "a liquidated demand . . . for the full amount stated in the property insurance policy" after "a total loss by fire."  Ark. Code Ann. § 23-88-101(a)(1).  Deemed a part of every homeowner's policy, the law prevents insurers "from receiving premiums on overvaluations, and thereafter repudiating their contracts as soon as it [is in] their interest to do so." *Tedford v. Sec. State Fire Ins. Co.*, 278 S.W.2d 89, 91 (Ark. 1955) (quotation marks omitted).

The problem for Merechka is that the valued-policy law does not shield fraud.  To put it in the Arkansas Supreme Court's words, "the beneficent effects of the statutory valued[-]policy provision . . . [cannot] be converted into a camouflage to conceal and protect fraud and crime," *Garmon v. Home Ins. Co. of N.Y.*, 126 S.W.2d 621, 625 (Ark. 1939), meaning that "the valuation in the policy is conclusive upon the parties" only "*in the absence* of a showing of fraud[] or misrepresentation,"

---

[2]Merechka cites several Arkansas waiver cases, but none are on point. *Farmers Union Mutual Insurance Co. v. Denniston*, for example, does not involve the submission of proof-of-loss forms containing material falsehoods.  376 S.W.2d 252, 254–56 (Ark. 1964).  And in *German Insurance Co. v. Gibson*, the insurer failed to act despite knowing that the policyholder had lied.  14 S.W. 672, 673–74 (Ark. 1890).  There is no comparable allegation here.

-12-

*Tedford*, 278 S.W.2d at 92 (emphasis added). Once Merechka lied on his proof-of-loss forms, it voided the policy altogether, making this a case "about whether there was any insurance at all," rather than "the amount of [the] insurance." *Garmon*, 126 S.W.2d at 625 (explaining that the valued-policy law addresses only the latter question).

Relying on the valued-policy law, he further argues that he is entitled to a full payout for his dwelling even if he lied about its contents. The assumption underlying his argument is that the insurance policy is divisible: one policy for the dwelling and a separate one for its contents. *See Globe & Rutgers Fire Ins. Co. v. Chisenhall*, 258 S.W. 135, 136 (Ark. 1924) (describing divisibility as having "two contracts of insurance embraced in one paper"). If the policy is divisible, voiding one has no effect on the other. *See id.*

Whether an insurance policy is divisible depends on whether the premiums are paid in a single "specified sum." *Phoenix Ins. Co. of Brooklyn v. Pub. Parks Amusement Co.*, 37 S.W. 959, 963 (Ark. 1896). Here, Merechka paid a flat annual fee of $2,375 to insure both his dwelling and its contents, making the contract "entire" rather than divisible, even if the policy itself "apportioned" the premium among "distinct items." *McQueeney v. Phoenix Ins. Co.*, 12 S.W. 498, 499 (Ark. 1889); *see also Pub. Parks Amusement Co.*, 37 S.W. at 963 (determining that a policy was indivisible even though "separate amounts of insurance were apportioned to separate items or classes of property").

The policy's plain language leads to the same conclusion. *See Firemen's Ins. Co. v. Larey*, 188 S.W. 7, 8 (Ark. 1916) (looking to "the intention of the parties as gathered from the language of the contract" in determining whether an insurance contract was divisible). First, the word "policy" is defined in the singular as the "entire . . . policy," not multiple policies. Second, there are numerous singular references to "this policy" throughout, including in the concealment-or-fraud provision. Finally, and perhaps most importantly, as a "[g]eneral condition[]," the concealment-or-fraud provision "appl[ies] to [Merechka's] policy in general, and to

-13-

each coverage in it." *See Neidenbach*, 842 F.3d at 567 ("[T]he fact that the policy might, in some circumstances, be regarded as severable . . . does not change [the policy's] plain meaning.").

All signs, in other words, point to indivisibility. "The consideration . . . was not divisible," *McQueeney*, 12 S.W. at 500, and "the language of the contract" specifies just a single policy, *Larey*, 188 S.W. at 8. In short, Merechka's misrepresentations voided the whole policy, not just a part of it. *See Pub. Parks Amusement Co.*, 37 S.W. at 963.[3]

## B.

With Merechka's appeal in the rearview mirror, we turn to Vigilant's cross-appeal. Once the case was in federal court, Vigilant filed a counterclaim to recover the $380,001 it had paid to Merechka's mortgage lender while its investigation was ongoing.

What is important is why. Merechka's policy had what is called a standard mortgage clause, which requires insurers to pay mortgage lenders and other "loss payee[s] . . . as interests appear." Under this provision, even if the policyholder's claim is denied, "that denial will not apply" to the mortgage lender if it has a "valid claim." Once the insurer pays the lender, it then becomes "subrogated to" the lender's rights, which means it stands in the lender's shoes and can seek reimbursement from the policyholder. *See Williams v. Globe Indem. Co.*, 507 F.2d

---

[3]We do not read *Public Parks Amusement Co.* as creating a separate *requirement* that the insured property be "all exposed to one risk" for a policy to be indivisible. 37 S.W. at 963. But even if it does, the property here was "exposed to one risk," *id.*, because it was "necessarily subject to destruction by the same conflagration," which in this case was a fire, *Geiss v. Franklin Ins. Co.*, 24 N.E. 99, 99 (Ind. 1890); *see also Pub. Parks Amusement Co.*, 37 S.W. at 963 (citing *Geiss* approvingly); *Jackson v. Grange Mut. Fire Ins. Co.*, 148 S.E. 125, 126 (W. Va. 1929) ("[A]ll the property covered by the policy was exposed to the same risk and was destroyed by the same fire.").

-14-

837, 839 (8th Cir. 1974) (applying Arkansas law and explaining that "[t]he theory of subrogation is that the subrogee steps into the shoes of his subrogor"). In Vigilant's view, this clause allowed it to pay the lender immediately and, if problems arose during the investigation, pursue Merechka on the back end. *See Nationwide Mut. Fire Ins. Co. v. Citizens Bank & Tr. Co.*, 431 S.W.3d 292, 297 (Ark. 2014) (observing that, under a standard mortgage clause, an insured's "fraudulent acts and the [resulting] rescission of the policy have no effect on the [insurance company's] independent contract with the mortgagee").

The district court, however, cut off this possibility by granting partial summary judgment to Merechka, even though no one had briefed the issue. We do not question the district court's authority to do exactly what it did here: enter summary judgment on its own motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). But it must follow the right procedure, which is to first "giv[e] notice and a reasonable time to respond" before it "grants summary judgment on grounds not raised by a party." Fed. R. Civ. P. 56(f)(1), (2); *see also Montgomery v. City of Ames*, 749 F.3d 689, 697 (8th Cir. 2014) (recognizing that the district court cannot "grant[] summary judgment on an issue not raised or discussed by the parties if the losing party did not have notice and an opportunity to respond").

To be sure, Merechka sought partial summary judgment on a different ground, and the district court asked two general questions about Vigilant's counterclaim at the summary-judgment hearing. But that is not enough. *See Walker v. Mo. Dep't of Corr.*, 138 F.3d 740, 742 (8th Cir. 1998) (per curiam) (reversing a sua-sponte grant of summary judgment based on the plaintiff's failure to meet one element of her prima-facie case, because the summary-judgment papers focused exclusively on another element). Neither side was "warn[ed]" that the court "was considering granting [partial] summary judgment" on another basis—one that presents a different question under Arkansas law. *Simpson v. Merchs. Recovery Bureau, Inc.*, 171 F.3d 546, 550 (7th Cir. 1999); *cf. Hubbard v. Parker*, 994 F.2d 529, 531 (8th Cir. 1993) (concluding that there was adequate notice when the court told the parties that it had "serious doubts that this case should go forward on any ground" but that

it "could be persuaded to turn around on any of the issues" (quotation marks and brackets omitted)).

For that reason, we cannot say that the procedural error was harmless. *See Kaestel v. Lockhart*, 746 F.2d 1323, 1324 (8th Cir. 1984) (per curiam) (concluding that "the district court's failure to give notice" may be "harmless error" if the "appellant [is] not prejudiced"). As Vigilant now argues, it would have drawn the district court's attention to cases allowing insurers to pursue their policyholders after paying off a mortgage lender. *See Hill v. Mass. Fire & Marine Ins. Co.*, 113 S.W.2d 104, 105 (Ark. 1938) (allowing a mortgage lender to "subrogate[] [its] rights [to]" the insurer "as against the [policyholder] to the extent of the amount so paid" (quotation marks omitted)); *see also Garrison v. Great Sw. Ins. Co.*, 809 F.2d 500, 501 (8th Cir. 1987) (explaining that "the rule in Arkansas" is that "when the insurer pays the mortgagee for its loss, the insurer becomes subrogated to the rights of the mortgagee to the extent that the insurer has paid the debt," and "the mortgagor" is "not discharge[d] . . . from his obligation"). To be clear, we are not saying that this line of cases necessarily applies here. Just that a remand is necessary to allow the district court to consider whether it does.[4] *Montgomery*, 749 F.3d at 697 ("Even if the factual record has been fully developed on those claims, [the losing party] had no opportunity to make legal arguments in support of [its] position.").

III.

One loose end remains. Merechka complains that the district court did not do enough when Vigilant failed to turn over three videos in a timely fashion during discovery. The first two showed the home as it burned. The third was surveillance

---

[4]Vigilant's briefs do not explain why dismissing the portion of the counterclaim seeking reimbursement for advance payments to *Merechka* was erroneous. So on that narrow issue, we leave the district court's grant of partial summary judgment in place. *See Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 341 (8th Cir. 2018) ("Since they do not develop their argument beyond [a] single sentence, we hold that they have forfeited it.").

footage that allegedly depicted Merechka's home, including the driveway and road leading up to it. Although Merechka brought the potential violations to the district court's attention, it refused to impose sanctions.

Even without "a discovery request," a party must provide its opponent with, among other things, "a copy . . . of all . . . electronically stored information . . . that the disclosing party has in its possession, custody, or control [that it] may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). A failure to do so can result in sanctions, although they are not "mandatory." *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004). And when the district court refuses to impose them, we review the decision for "an abuse of discretion." *SPV-LS, LLC v. Transamerica Life Ins. Co.*, 912 F.3d 1106, 1112 (8th Cir. 2019) (quotation marks omitted).

There was no abuse of discretion here. The first two videos were handed over once Vigilant discovered that the fire investigator had mistakenly failed to send them. Turning them over earlier would not have made a difference because no one argues that the fire was anything other than an accident, so they would not have supported any "claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii); *see Davis*, 383 F.3d at 765 (affirming the denial of sanctions when the movant "failed to explain how an earlier disclosure of [the] testimony would have enabled her to avoid summary judgment" (internal quotation marks omitted)). As for the third video, it was never produced, but the record does not establish that Vigilant ever had it "in its possession, custody, or control." Fed. R. Civ. P. 26(a)(1)(A)(ii).

IV.

We accordingly affirm in part, reverse in part, and remand for further proceedings.

_____